(76 South. 434)

TALLASSEE OIL & FERTILIZER CO. et al. v. H. S. & J. L. HOLLOWAY.

(5 Div. 620.)

(Supreme Court of Alabama.　June 21, 1917.)

1. MONOPOLIES ⟜9—COTTON GIN—GOVERNMENTAL REGULATION.

When a private person undertakes the ginning of cotton for the public, his gin is dedicated to the public use, and becomes clothed with a public interest, affecting the community at large and subject to governmental regulation. (Per Gardner, Somerville, and Thomas, JJ.)

2. MONOPOLIES ⟜24(1) — INJUNCTION—COTTON GIN.

In view of Laws 1909, p. 247, making it unlawful for any corporation engaged in buying cotton seed and in the operation of a public ginnery to make different prices to those customers who do and those who do not sell their cotton seed to it, a cotton ginning company which had virtually a monopoly of the business in the immediate vicinity of a city, but refused to gin for any of the public who would not sell it their cotton seed, had no right thus to unfairly discriminate among its public patronage, having dedicated its property to public use, and might be enjoined at suit of aggrieved competing dealers in cotton and cotton seed, the dealers' remedy at law by action for damages as provided by Code 1907, § 2487, being inadequate. (Per Gardner, Somerville, and Thomas, JJ.)

3. MONOPOLIES ⟜24(1)—INJUNCTION.

Injunction will lie where cotton gin company having monopoly of such business refuses to gin cotton unless owner agrees to sell to it his cotton seed.

Mayfield and Sayre, JJ., dissenting.

Appeal from Circuit Court, Elmore County; W. W. Pearson, Judge.

Bill by H. S. & J. L. Holloway against the Tallassee Oil & Fertilizer Company and others. From a decree overruling motion to dissolve a temporary injunction, respondents appeal. Affirmed.

This bill was filed by the appellees, H. S. and J. L. Holloway, against the appellants, the Tallassee Oil & Fertilizer Company and F. L. Owen and T. W. Brunson, president and secretary of said company.

Complainants set up in the bill that they, under the firm name of H. S. and J. L. Holloway, are engaged in the buying and selling of cotton and cotton seed, along with other business, in the town of Tallassee, Emore county, and that the Tallassee Oil & Fertilizer Company, a corporation with its principal place of business at Tallassee, is also engaged in buying and selling cotton and cotton seed, as well as in the business of operating a public ginnery; that the gin owned by said fertilizer company is situated in the town of Tallassee, in a location convenient to all the surrounding territory; that there is one other public gin operated by water power on the banks of the Tallapoosa about a mile distant from the one in question, and which is located at the base of high hills, and convenient only to points in Tallapoosa and Macon counties; that it is impracticable and expensive to haul cotton from other points to this latter gin, the capacity of which is limited, and that there are no other gins within a radius of four miles of Tallassee; that the vicinity is thickly settled, and Tallassee is the most convenient market for a majority of the farmers and cotton growers of that section; that the ginning plant operated by respondents is of large size, operating six 80-saw gins and ginning about three-fourths of all the cotton brought to Tallassee, thus giving the said fertilizer company a monopoly of the ginning business for that locality. The bill avers that the said company has instituted and practiced the rule that it will gin only for such customers as agree in advance to sell the seed to said company, except in cases where the owner is permitted to keep the seed for his own use under agreement not to sell it to "any person, firm or corporation other than the Tallassee Oil & Fertilizer Company." The bill further avers that notwithstanding the arrest of its agents or employés under criminal process for violation of the laws against restriction of trade, the company continues to enforce said rule; that the said company has a printed notice posted at its place of business that reads substantially as follows:

"We gin only for persons who sell us their seed, but we pay the market price for same"

—and that this policy and course of action has tended to destroy competition in the sale of cotton seed in the town of Tallassee. The bill alleges that complainants are greatly injured in their business and deprived of free and open competition in the purchase of cotton seed, and that the monopoly thus established by the said fertilizer company will be continued in force unless restrained by the court; that the complainants are without adequate remedy at law; and that, not only the business interests of complainants are being so injured and interfered with, but also the interests of the community are affected. And the prayer of the bill is for an injunction, restraining the said corporation from enforcing the aforesaid rule of practice in restraint of free competition in the cotton seed business in the town of Tallassee, and from discriminating in any manner in the purchase of cotton seed from persons having their cotton ginned by said company.

The bill was amended so as to show the charter of the respondent corporation, which is made an exhibit to the bill, and by averring that said charter discloses that the company is a manufacturing corporation, within the provisions of Code, § 3485, authorizing the exercise of the right of eminent domain for the purposes therein stated, and that it is a public, or quasi public, corporation and under the control of the laws affecting public service corporations.

The bill was demurred to for want of equity, and upon the further ground that it is not disclosed that the respondent is under

any legal obligation to gin cotton for all comers. The answer denies that this company has a monopoly in the business in Tallassee, and by its amended answer, filed October 8, 1915, respondent admitted the establishment and practice of the rule referred to, and set up in justification the complainant's conduct in instituting what is referred to as a "seed right," advancing the price of cotton seed; the operation of the gin referred to in the original bill as situated on the Tallapoosa river, and other business reasons.

Temporary injunction was ordered issued on the original bill on September 15, 1915, the original bill being filed September 28th. Answer and demurrer to the original bill were filed October 1, 1915, and affidavits were filed by both complainants and defendant on October 7, 1915. On September 28, 1915, respondents moved the court to dissolve the temporary preliminary injunction issued in the' cause and assigned the following grounds:

"(1) There is no equity in the bill. (2) Said bill sets forth no cause entitling plaintiff to relief by injunction."

This motion was set down for hearing on October 7, 1915, and submitted on that day. On January 10, 1916, the court entered a decree overruling the motion to dissolve the temporary injunction and from this decree the respondents prosecute this appeal.

W. M. Weston, of Tallassee, and T. G. Hilyer, J. M. Holly, and Smoot & Mullins, all of Wetumpka, for appellants. Frank W. Lull, of Wetumpka, for appellees.

GARDNER, J. The substance of the bill of complaint is set out in the foregoing statement of the case. Its object is to enjoin the respondent from operating its cotton gin in such a discriminatory manner by refusing to gin cotton for those of the public who do not agree to sell respondent their cotton seed, thereby stifling competition in the sale of cotton seed, in which business complainants are also engaged. The bill shows that the respondent company is engaged in ginning cotton for the public and has virtually a monopoly of that business in that particular locality.

It seems to be the'insistence of counsel for appellant that this class of business is of a private nature and not subject to the rule of the common-law doctrine against monopolies and the stifling of competition, and has not been declared subject to governmental regulation. Mills for the grinding of corn for the public were regarded under the common law as property devoted to a public use and affecting the public interest, and therefore subject to governmental regulation. They were placed in the same category with common carriers, ferries, common wharves, and similar enterprises affecting the public at large. In the case of State of Maine v. Edwards, found cited in 86 Me. 102, 29 Atl. 947, 25 L. R. A. 504, 41 Am. St. Rep. 528, the Supreme Court of Maine in discussing the regulation of gristmills, said:

"Mills for the grinding of grain and for the sawing of lumber for all comers have been aided or established by the Legislature from the earliest colonial times. Those mills were usually water mills; but it is of no moment what the propelling power may be. Burlington Twp. v. Beasley, 94 U. S. 310, 24 L. Ed. 161. They have always been considered so necessary for the existence of the community that it was proper for government to foster or maintain them, And, in the absence of government aid, the individual proprietor, not pretending to serve the public, might maintain such mills as private mills, free from legislative interference, precisely as he might maintain a store, shop, or other private business; but when such proprietor makes his mill public, assumes to serve the public, then he dedicates his mill to public use, and it becomes a public mill, subject to public regulation and control. He is not compelled to continue such public use, but, so long as he does, he becomes a public servant, and may be regulated by the public."

See, also, Mayor & Aldermen of Mobile v. Yuille, 3 Ala. 137, 36 Am. Dec. 441, and Moore v. Wright & Rice, 34 Ala. 311; Birmingham Water Works Co. v. Brown, 191 Ala. 457, 67 South. 613, L. R. A. 1915D, 1086.

[1] Cotton gins were, of course, not so classed by the common law, for the reason that they are of comparatively modern invention, dating back no further than the year 1792. The question as to when private property becomes so clothed with a public interest and used in such a manner as to make it of public consequence was treated by the Supreme Court of the United States in German Alliance I. Co. v. Lewis, 233 U. S. 389, 34 Sup. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189, and also in Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77. It was also interestingly discussed in McCarter v. Fire Ins. Co., 74 N. J. Eq. 372, 73 Atl. 80, 29 L. R. A. (N. S.) 1194, 135 Am. St. Rep. 708, 18 Ann. Cas. 1048. We do not consider that the instant case requires a full discussion of these authorities and of the principles upon which they rest, but content ourselves with their citation merely. We live in a great agricultural state, and cotton has long been recognized as our chief staple, considered as the foundation of the wealth and prosperity of the agricultural sections of the state. Its preparation for market is therefore of the utmost concern to the public at large. Any one has of course the right to erect a gin for his own private purposes, but when he undertakes the ginning of cotton for the public his gin is dedicated to the public use, and under the authorities above cited, it becomes clothed with a public interest affecting the community at large and subject to governmental regulation.

[2, 3] According to the averments of the bill in this cause, the respondent company had virtually a monopoly in the cotton ginning

business in the immediate vicinity of Tallassee, but refused to gin for any of the public who would not sell it their cotton seed, which rule of practice tended to stifle competition and is contrary to the public policy of the state. Having thus dedicated its property to public use the fertilizer company had no right to thus unfairly discriminate among its public patronage. The practice complained of might not come within the letter of the act of August 29, 1909 (Gen. Acts S. S. 1909, p. 247), making it unlawful for any person, firm, or corporation engaged in buying cotton seed, and also in the operation of a public ginnery in this state, to make different prices.to those customers who do and those who do not sell their cotton seed to such person, firm, or corporation, but it comes clearly within the spirit of said act. See, in this connection, section 7581, Code 1907, providing penalties for restraint of competition in trade. Speaking to the question, this court, in Arnold v. Jones Co., 152 Ala. 501, 44 South. 662, 12 L. R. A. (N. S.) 150, said:

"While the utmost liberty of contract, consistent with the rights of others, must be allowed, yet it must be seen that the exercise of that liberty does not impinge upon the rights of the public generally or of individuals. Combinations to enhance or depress prices are recognized as contrary to public policy and void. Nearly all of the decisions on the subject of preventing and 'stifling' competition involved combinations among those having commodities for sale to hold up the prices; but the principle is the same, whether the combination be upon the part of the sellers or of the purchasers. He who has commodities to sell in the market has the same right to competition among buyers as the purchaser has to competition among sellers."

It is insisted that complainants cannot maintain a bill of this character; that their only remedy is an action for damages, as provided by Code, § 2487, and that, aside from this, the discontinuance of the practice complained of rests alone in the government. 20 Am. Enc. Law, 862; 7 Cyc. 907. We do not think this position is well taken. . The bill shows on its face that the complainants are competitors with the respondent in the buying of cotton seed in that particular locality, and that by the unfair methods practiced by respondent the complainants' business is injured and will be destroyed if such practice in restraint of free trade is allowed to be continued. The right to maintain a suit of this character was considered by the Supreme Court of Iowa in the recent case of Reeves v. Farmers' Soc., 160 Iowa, 194, 140 N. W. 844, 44 L. R. A. (N. S.) 1104. It was there held that the suit could be maintained. This conclusion seems to be rested on common sense and justice. That the complainants' remedy at law is inadequate is quite clear. They are engaged in a lawful business, and have a right to free and untrammeled competition. The practice here complained of is alleged to be ruinous to the continuance of their business. Speaking to

the question, the Supreme Court of Iowa, in the above-cited case, said:

"It is contended that, conceding the arrangement and agreement is illegal, plaintiff is not entitled to an injunction to restrain the defendants from carrying it out. It seems to us that plaintiff has suffered a wrong, and that he is threatened with further injury to his business, growing out of defendant's illegal acts. In virtue of his being a competitor with the defendant association, he has the right to free and untrammeled competition with it; and if through illegal means he has been made to suffer in the past, and will do so in the future, he is entitled to the protective arm of the court. * * * If, for no other reason, he is entitled to an injunction to avoid a multiplicity of suits. In at least two cases it has been held that one circumstanced as plaintiff may maintain an action to enjoin the illegal acts. * * * [Employing Printers' Club v. Doctor Blosser Co., 122 Ga. 509, 50 S. E. 353] 69 L. R. A. 90, 106 Am. St. Rep. 137 [2 Ann. Cas. 694]."

The motion to dissolve the injunction was rested solely upon the ground of a want of equity in the bill, and not upon the answer and affidavits accompanying the same. We have therefore considered only the equity of the bill. It may not be improper to state, however, in view of the fact that affidavits were offered, that after examining the entire record we conclude that the averments of the bill are fully supported by the affidavits offered, and that the motion to dissolve the injunction was properly overruled. It results that the decree will be affirmed.

Affirmed.

SOMERVILLE and THOMAS, JJ., concur in opinion. ANDERSON, C. J., and McCLELLAN, J., concur in conclusion only.

MAYFIELD, J. (dissenting). I cannot concur in this decision. I do not believe that a court of equity, either at common law or under our statutes, has ever been authorized to grant the relief here prayed, or any other relief appropriate under the facts shown by this record.

Aside from the conclusions of the pleader, I find nothing to show wrong that would support an action for damages, or any wrong amounting to an offense against the state, the public, or the complainant.

The facts alleged are: That there are, or were, when the bill was filed, only two cotton gins in a given vicinity; that one of them was more advantageously situated than the other, and, consequently, secured the ginning of about three-fourths of the cotton in the community, and that it refused to gin cotton for any of its customers unless they would sell to the ginning company the seed therefrom. How or wherein this course constituted a wrong susceptible of being righted by a court of law or of equity I am unable to understand. Even if the gin be a public one, or a corporation or business affected with a public interest, there is shown no discrimination between the patrons—all are treated alike. If there was any possible wrong, it

was in the laying of unreasonable requirements on its patrons, and correction thereof or redress therefor was not obtainable through injunctive relief. Such is not the office or function of injunctive relief. The court cannot by such process compel the respondent to gin for patrons who will not agree in advance to sell their seed to the gin company; nor can it prevent other patrons from so' agreeing, in the absence of a statute making it unlawful to enter into such an agreement. The case made by the bill is clearly not within the statute. Acts 1909, p. 247. The title, as well as the whole purpose of the bill, is, to make it unlawful for a public ginner to charge a patron from whom he buys seed less for ginning this patron's cotton than he does one from whom he does not purchase the seed. This bill does not attempt to show a discrimination, but it shows absolute uniformity, both as to the price for ginning and the price paid for seed; all patrons are treated alike.

It may be that cotton gins are so related to the public, or affected by a public interest, that the Legislature might declare what should be a public gin, and what not, and fix the amount of toll which the public gins should charge, prohibiting them from charging more, and providing penalties for violations of the statute, and thus make the tolls uniform, as the Legislature has done with regard to gristmills; but thus far the Legislature has not seen fit to attempt to regulate gins in any manner except as shown in the above statute. And that statute does not declare or define what are public gins, nor fix any tolls, nor does it attempt to prevent discriminations except as between those who sell their seed to the gin company and those who do not sell. The Legislature has never attempted to prescribe or fix the amount of toll for ginning cotton; and, in the absence of such statutes, how can it be fixed except by contract, express or implied, between the parties? Courts, surely, cannot fix them.

The statutes of this state giving ginners a lien for tolls do not attempt to fix the amounts, but expressly leave that matter to be settled by contract, and provide a remedy for enforcing the contract made by attachment. These statutes leave it to the ginners to fix the price, and require them to advertise their tolls in order to be entitled to the lien. Section 4822 of the Code provides:

"Any public ginner who shall give public notice of the price for ginning, and the price at which bagging and ties will be furnished, by posting the same at the gin, shall have a lien paramount to all other liens upon the cotton ginned and baled by him under any contract with the owner of such cotton for the amount agreed upon for such ginning and baling, or, in the event no price was agreed upon, then for the advertised price, so long as the cotton ginned and baled remains at the gin or in the possession of the owner of the gin, and if such cotton should be removed without the knowledge and consent of the ginner, the lien herein declared shall follow the cotton. The ginner shall have the right to hold any cotton ginned by him until the full amount of the charges due thereon shall have been paid."

Neither these statutes, nor any others, so far as I know, attempt to fix the price or toll, or whether it shall be payable in money only, or in part of the cotton, or in a part or all of the seed, or attempt to say that a part or all of the toll may not be the consideration that the owner will sell the seed to the ginner. They do not attempt to prevent discriminations, or to make the price of ginning uniform in amount or kind of consideration. The only discrimination which is inhibited by the statutes is that between those who sell seed to the ginner and those who do not sell. This, in effect, recognizes the right to make other discriminations.

It is perfectly well known that cotton is usually ginned by and under special contracts between the ginner and his various customers, the law not fixing the tolls; the gin is not in the class of gristmills. It may be that a ginning toll may have become so uniform and so nearly universal of recognition as that no express contract involving it is considered necessary between the ginner and all his customers; but in such a case the contract is implied. The law has not attempted to make the contract for them, or even to prescribe limits, except that the ginner shall not discriminate by making those who do not, or will not, sell him the seed pay more toll than those who do so sell or agree to sell to him. With this exception, he may discriminate and fix the toll by agreement with the customer, and be well within the law, common or statute.

In this case no discrimination is attempted to be shown; but the burden of the complaint is that the rate or toll is uniform, and not shown to be unreasonable or oppressive. But it is alleged that the effect of the custom is detrimental to complainant, who is a local competitive buyer of seed. The common law prohibited extortion by public servants or public service corporations, but it did not prohibit discrimination; it required state and federal statutes to prevent this, or to fix rates for the services. The courts do not now have, and never have had, the power to fix rates in these cases. It would probably be desirable by both appellant and appellee, respectively, to have the field to himself—to have no competitor—in the buying of seed, and it certainly would be to his advantage; but the law will not remove one of the competitors because the facts that the particular location of his business, and that he owns and operates a gin, operate to his advantage over another.

This injunction, if made perpetual, will have the effect, not to promote but to retard competition, in that it will remove one gin from the community or prevent its operation, and impede or put at a disadvantage, relatively speaking, one of the buyers, and make him

conform to the ideas or circumstances of another buyer. Neither the trial court nor this court can compel appellant to gin cotton on terms to which he and his customers do not agree, nor on the terms which his various customers might fix, nor even on those of his competitor's. The law does not constrain him to gin for all nor for any one customer. In these respects he is a free man.

It may be that this ginner has contracts with many customers to gin their cotton, that they have agreed upon the terms, and that the sale and purchase of the seed was a part of the consideration moving both parties to make these contracts, yet this bill is intended to prevent the performance of these many contracts, an'd this, when only one of the parties to the contracts is before the court.

And it may be that the customers would not allow the appellant to gin their cotton until he agreed to buy their seed. It may be to their advantage, as well as to that of appellant, that the latter buy their seed. The courts cannot compel parties to make a contract, or dictate to them the terms thereof, and certainly not when only one party to the contract is before the court. Yet this is the avowed object an'd purpose of this bill. Suppose the courts should say to one:

"You must not make your right to buy seed a condition upon which you will gin the cotton of any customer."

Will the courts attempt to say what contract he shall make, or what tolls he shall receive, or what the customers shall pay, or whether they shall pay in money, or in a part of the cotton containing the seed, or in a part of the lint only, or exclusively in all or a part of the seed, or what else, in kind, quantity, quality, or value, the consideration shall be?

And unless the courts do so say, how will the ginner or his patrons know how to contract? If they attempt to make new contracts, this complainant, or some other competitor in the ginning or seed-buying business, might not like it, and might (as was 'done in this case) file another bill against the ginner alone or prevent the enforcement of the new contract, notwithstanding such complainant is not a party to same. Of course I do not suppose that any of these conditions will arise; but I state them as possibilities which demonstrate the error of this decision.

Of course if the law expressly or impliedly required respondent to gin the cotton of all comers, and fixe'd the price (which was not the price being charged), and required the cotton to be ginned in the order in which it was brought (as it now requires grist to be ground in the grist mills), there might be equity in this bill; but I have shown that the law does not command or require these things, and for my life, I can fin'd no equity in this bill, nor conceive how the injunction can ever be enforced.

If the temporary injunction is made perpetual, the result will be the opposite of that sought by the bill. The order now in force, in effect, says to appellant:

"You must not refuse to gin cotton for any one unless such person will agree to sell you the seed."

In other words, if the customer will not sell you the seed, you may then refuse to gin his cotton.

I do not think this is the relief sought, or what the court intended to grant; but it is what is thus far afforded.

SAYRE, J., concurs.