[Civ. No. 17364.   Second Dist., Div. Three.   Aug. 25, 1950.]

KOLD KIST, INC. (a Corporation) et al., Respondents, v. AMALGAMATED MEAT CUTTERS AND BUTCHERS WORKMEN OF NORTH AMERICA, LOCAL NO. 421, et al., Appellants.

Charles P. Scully for Appellants.

Ben Gould and Latham & Watkins for Respondents.

SHINN, P. J.—Plaintiffs, Kold Kist, Inc., Arbo Frozen Meat Products, Inc., Frank Watson and Edward Kendall, partners doing business under the name of Arbo Food Distributors, Vernon Meat & Provision Co., and Jacob Feiler, are in the business of selling frozen meats, poultry and fish. Their customers include a large number of stores and markets named as defendants in the action. Amalgamated Meat Cutters and Butchers Workmen of North American Local No. 421, and Amalgamated Meat Cutters and Butchers Workmen of North America Local No. 587, are unincorporated voluntary associations functioning as labor organizations and members and affiliates of American Federation of Labor. Defendant George Swan is a representative of the unions.

Upon application of plaintiffs the superior court issued a temporary injunction which restrains the defendants from entering into an agreement between the unions on the one part

and the several stores and markets on the other part. This proposed agreement contains provisions which had been negotiated and agreed upon by and among the defendants, and which the court held to be in restraint of trade, in violation of law, and contrary to public policy. The unions appeal. For convenience we shall refer to them as defendants.

The gravamen of the charge of illegality consists in the alleged violation of the Business and Professions Code, sections 16720 to 16758, the provisions of which are based upon the Cartwright Act, Statutes 1907, chapter 530, page 1907.

Section 16720 provides, in part, "A trust is a combination of capital, skill or acts by two or more persons for any of the following purposes: (a) To create or carry out restrictions in trade or commerce. (b) To limit or reduce the production, or increase the price of merchandise or of any commodity. (c) To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity. (d) To fix at any standard or figure, whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, barter, use or consumption in this State." The remainder of the section deals with price fixing. Under subdivisions (a) and (c), combinations for restraining trade or commerce, or to prevent competition in the sale of a commodity, are trusts, even though reduction of production or increase of price is not intended or accomplished. Such combinations are trusts, against public policy, and void. (§ 16726.) Any violation of chapter 2 is a conspiracy against trade that is punishable by fine or imprisonment or both. (§ 16755.) It provides (§ 16750) that anyone suffering injury to his business or property by reason of the prohibited acts may recover twofold the damages he has sustained.

It was alleged in the complaint "That the members of Defendant Unions are employees of Defendant Markets whose daily work consists of cutting, wrapping and selling fresh meat, poultry and fish kept for sale in the meat departments of the stores of Defendant Markets, said employees being hereafter for convenience referred to as 'meat clerks'."

It was also alleged that defendant merchants, to be referred to as "markets," sell at retail plaintiffs' frozen fruits, vegetables, ice cream, pies, etc., from freezers maintained at zero temperature which are equipped with sliding and transparent

lids; that the customers desiring to purchase from said freezers have in view the articles contained therein, choose and remove such articles as they desire to purchase, take the same to the grocery clerks where they are checked and paid for. This "self service" is uniform throughout defendant markets. Each of defendant markets maintains high temperature cases at approximately 35 degrees Fahrenheit for the storing of fresh meat, poultry and fish, but approximately 80 per cent of the markets have no refrigeration facilities in which frozen meat, poultry and fish may be kept other than the aforementioned freezers which are maintained at zero temperature and from which all frozen products are sold. The grocery departments of the markets remain open after 6 o'clock p. m., and on Sundays and holidays, and substantial portions of the sales of plaintiffs' frozen meat, poultry and fish are made after 6 o'clock p. m., and on Sundays and holidays.

Defendants have negotiated and were prepared to execute an agreement which contained the following provisions: "Article 15 (b) : Local 421 (587) shall have jurisdiction over all meats that are not cut and prepared for immediate human consumption, including packaged items of fresh, frozen and smoked meats, fresh or frozen fish, poultry and rabbits.

"Article 15 (c) : Where low temperature and/or self service cases are used for any of such merchandise coming under the jurisdiction of Local 421 (587), such cases shall be serviced only by members of Local 421 (587). The opening and closing hours in Article 12 of this Agreement shall be applicable to the sale of such merchandise."

It was alleged: "That under the terms of the proposed Articles referred to hereinabove as set forth in Paragraph VIII hereof, Defendant Markets will be unable to sell Plaintiffs' frozen meat, poultry and fish after 6:00 o'clock p. m. on week days and on Sundays and holidays, as there will be no meat clerks on duty having jurisdiction of the sale thereof, as provided in said Articles;

"That approximately 80% of Defendant Markets will be unable to store and maintain Plaintiffs' frozen meat, poultry and fish on their premises at all for the reason that if they keep the low temperature cases open after 6:00 o'clock p. m., and on Sundays and Holidays, customers of Defendant Markets will attempt to purchase Plaintiffs' frozen meat, poultry and fish, by taking the same to grocery clerks who are not permitted to handle such products or will have to close said low temperature cases and stop the sale of other frozen foods

kept therein; that approximately 80% of said Defendant Markets will be unable to take said frozen meat, poultry and fish out of said cases on account of the fact that they do not have storage elsewhere for frozen foods; That the confusion resulting therefrom will substantially deter many of Defendant Markets from purchasing Plaintiffs' frozen meat, poultry and fish at all, to Plaintiffs' damage; that the cost of providing separate frozen food storage for the storing of frozen meat, poultry and fish after hours and on Sundays and holidays would be so prohibitive as to many of Defendant Markets as to deter them from handling Plaintiffs' frozen meat, poultry and fish;

"That it would be impractical to take out of the low temperature cases the frozen meat, poultry and fish at the end of each day and at the end of the week, as it is detrimental to the food value and fitness for consumption of such frozen foods to take them out and put them back into low temperature cases; that it has been the experience of Plaintiffs that to do so spoils and discolors frozen meat, poultry and fish."

It was alleged "that said provisions of the proposed contract are primarily designed and intended to prevent, restrict and diminish the manufacture and sale of plaintiffs' frozen meat, poultry and fish packed for sale by self service from low temperature cases contained in the stores of defendant markets," and also that the defendants "propose to enter into a contract or agreement to prevent, restrict and diminish the manufacture and sale of plaintiffs' frozen meat, poultry and fish, and unless defendants are restrained from so doing and restrained from entering into an agreement which contains the provisions set forth in paragraph VIII hereinabove, plaintiffs' businesses will be irreparably damaged as hereinabove alleged." An affidavit was filed by E. W. Jarvis, president of Kold Kist, Inc., in which he stated that a substantial portion of his company's sales of frozen meats was made after 6 o'clock p. m., on weekdays and on Sundays and holidays; on information and belief that some time during the month of June, 1948, defendant unions informed defendant markets that said frozen meat was not to be sold after 6 o'clock p. m. on weekdays and on Sundays and holidays; that a number of defendant markets which and who are customers of said corporation have complied with the demands of said unions and have discontinued sale of said frozen meats after 6 o'clock p. m. on weekdays and on Sundays and holidays; "that as a result thereof the sales of said Corporation's frozen meats to

said Defendant Markets have been substantially reduced and some of Defendant Markets have discontinued purchasing the Corporation's frozen meats altogether. That said Corporation has suffered a very substantial loss in income and business from the activities of said Defendant Unions, designed toward preventing, restricting and diminishing the output of the frozen meats of said Corporation.'' Two affidavits were filed on behalf of the unions. It was shown thereby that since 1942 agreements between the butcher shop industry and the unions have required the closing of meat departments at 6 o'clock p. m. daily and on Sundays and holidays. The affidavits denied that it was the purpose of the unions to prevent, restrict or diminish the output of frozen meats, but defendants did not deny by affidavits or answer any of the other allegations of the complaint or the affidavit filed on behalf of plaintiffs. Defendant's affidavits, however, stated: ''The only purpose of the 6:00 p.m. closing is to insure work for the members of the Local and to safeguard the health of the members of the Local from excessive hours of employment.''

Defendants contend: (1) That the proposed agreement would not operate to restrain trade; (2) that the sole purpose of the unions is to regulate hours of employment and that if restraint of trade should result it would be merely as an incident to the attainment of a proper labor objective by the unions and therefore the restraint of trade would not be illegal; (3) that the court is without power or jurisdiction to enjoin practices that are in restraint of trade unless such practices are engaged in for the purpose of fixing prices and creating monopoly; (4) that the recovery of double damages for injuries suffered from combinations for the restraint of trade is the exclusive remedy of an injured party.

The first question is whether the proposed practices of the defendants would operate as an unlawful restraint of trade. On the application for a temporary injunction the allegations of the complaint, which were undenied, were to be taken as true by the trial court and the same rule applies on appeal. Presumably the trial court concluded from these facts that the practices which would be put into effect if the agreements were entered into would interfere with, prevent, and diminish the sales of plaintiffs' products and would be in restraint of trade. Since all intendments are in favor of the correctness of the temporary injunction, we must assume that the trial court deemed it to be established, as stated in the affidavit of Mr. Jarvis (President, Kold Kist, Inc.), that a

number of defendant markets have, because of the demands of the unions, discontinued the sale of plaintiffs' products after 6 o'clock p. m., on weekdays, and on Sundays and holidays, that some of defendant markets have discontinued purchasing Kold Kist's frozen meats, and that as a result thereof the sales of said plaintiffs' meats have been substantially reduced and said plaintiff has suffered a very substantial loss of income and business as a result thereof. (Other facts which must be taken as true have been mentioned above.) Another important fact which must be taken as true is that much confusion would follow if plaintiffs' customers found frozen meat, fish and poultry in the freezing cases after 6 o'clock p.m. on weekdays, and on Sundays and holidays, and although desiring to purchase them were unable to do so since the markets would be unable to sell them because of their contractual obligations with the unions. The markets, it was alleged, rather than invite and suffer the displeasure and disapproval of their customers, would discontinue the self service sale of plaintiffs' products. This situation could not be avoided by approximately 80 per cent of the markets, for the reason that they do not have, and would not be justified in installing, separate low temperature cases in which to store frozen meats, poultry and fish if these products should be removed from the low temperature cases now in use, from which many other frozen products and articles are sold.

That accomplishment of the plan of defendants would materially diminish the sales of plaintiffs' products must, upon the record before us, be deemed established. It will appear from our further discussion that the result would be to illegally restrain trade.

■ While combined action which is in restraint of trade, as the term is commonly used, is illegal, regardless of the objective of the parties, it is also illegal if it is entered into for the purpose of restraining trade. ■ Even though it appeared to be the purpose of the unions to improve the status of their members by limiting hours of work it was a proper inquiry whether it was intended to accomplish this purpose by placing restrictions upon the trade in plaintiffs' products through the prevention of the sale thereof except through union members.

■ Defendant unions maintain that any interference with plaintiffs' business will be merely incidental to the limitation as to days and hours when such products may be sold, and

that it is entirely lawful and proper to accomplish this purpose through an agreement that the members of the union shall not be required to work on Sundays or holidays or after 6 o'clock p. m. on weekdays and the further agreement that none but members of the union may handle sales of plaintiffs' products. We think that the trial court had reason to disagree with this contention. The work of the union members consists of "cutting, wrapping and selling fresh meat, poultry and fish kept for sale in the meat department of the stores of Defendant Markets." It was not shown, in contravention of this allegation, that they have anything to do with the sale of frozen meat, poultry and fish sold from the markets' self service cases. We infer from the briefs that it will be, and perhaps has been, the practice of the butchers to place plaintiffs' products in the low temperature cases, but it would appear that this work may be done during the agreed working hours without interfering with the sales of the products at other times. However this may be, it appears without dispute that the self service customers make their purchases of the articles, not through the butchers, but through the grocery clerks. The provision in the proposed agreement that the unions are to have "jurisdiction" over frozen meats, fish and poultry is conceded to mean that such articles may not be sold through employees other than butchers. Thus the transfer of the sale of plaintiffs' products from the grocery clerks to the butchers would create duties for the latter which they have not heretofore performed. These duties would, of course, be assumed by them only upon condition that they would not be performed on Sundays or holidays or after 6 o'clock p. m. on weekdays.

We feel that it is significant that the agreement does not change the work hours of the union members nor does it change the conditions of their employment. The purpose of the unions in fixing 6 o'clock p. m. as the closing time is said to be to insure work for the members of the Local and to safeguard their health from excessive hours of employment. This is, of course, a legitimate labor objective. There is, however, no relation between the cessation of work by the union members at 6 o'clock p. m. and the prevention of the sale of the frozen articles after 6 o'clock p. m. and on Sundays and holidays, since the union members do not propose to work at all during those times. In other words, there is no true relation between the stated objective and the means proposed to be used to accomplish it. The work hours of the butchers are not the subject of dispute. The controversy does, however,

affect the work of other employees who have equal rights, although this is an incidental result. To prevent others from carrying on their usual duties at times when the union members are not working would tend to curtail the volume of sales during those periods. We think the trial court would have been justified in concluding from the evidence that it is the desire of the unions, and their purpose, to gain for themselves the exclusive right to handle sales of the frozen articles solely in order to prevent them from being sold at times when the butchers are not selling the fresh articles in competition with the frozen ones. The unions have not brought to light facts indicating that they have any other purpose. It is quite reasonable to suppose that the elimination of any degree of competition of the frozen articles with traffic in the fresh ones would be of some advantage to the latter. It is more a question of the purpose and tendency of the action than of degree, but inasmuch as it is alleged that plaintiffs have suffered substantial loss it may be inferred that substantial advantage was expected to accrue to the butchers under the proposed agreement. In the absence of any other reasonable explanation of the purposes of the unions it is logical to infer that their motive was to accomplish the results which have already been accomplished to a measurable extent, and would be accomplished to a greater extent under the operation of the proposed agreement. Defendants have not furnished a satisfactory answer to the claims of plaintiffs that they have a right to have their products sold in the usual and natural course of trade to customers who find it inconvenient or impossible to make their purchases during the days and the hours to which the unions have voluntarily limited the services of their members. This is a class of trade to which the unions do not propose to cater. The fact that it is considered by them to be undesirable is not a good reason for allowing it to be destroyed. Upon the facts in evidence, the trial court was justified in concluding that the primary purpose of the defendants was and is to restrain and diminish trade in plaintiffs' products by preventing the sale thereof at times when the butchers are not selling the competing fresh foods, and by this means to secure benefits for the union members through increased sales of fresh products.

In *City of Los Angeles* v. *Los Angeles etc. Council*, 94 Cal. App.2d 36, 42 [210 P.2d 305], we held, on the authority of the following cases: *Hughes* v. *Superior Court*, 339 U.S. 460

[70 S.Ct. 718, 94 L.Ed. 985] ; *Northwestern Pac. R. R. Co. v. Lumber & S. W. Union,* 31 Cal.2d 441 [189 P.2d 277] ; *Park & Tilford I. Corp.* v. *International etc. of Teamsters,* 27 Cal.2d 599 [165 P.2d 891, 162 A.L.R. 1426] ; *James* v. *Marinship Corp.,* 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900] ; *Riviello* v. *Journeymen Barbers etc. Union,* 88 Cal.App.2d 499 [199 P.2d 400] ; *Bautisto* v. *Jones,* 25 Cal.2d 746 [155 P.2d 343] ; *Fashioncraft, Inc.* v. *Halpern,* 313 Mass. 385 [48 N.E.2d 1] ;. *Schwab* v. *Moving Picture Mach. Operators Local,* 165 Ore.' 602 [109 P.2d 600] ; *Markham & Callow, Inc.* v. *International Woodworkers,* 170 Ore. 517 [135 P.2d 727], that: ". . . illegality of purpose provides a complete basis for injunctive relief against conduct which would otherwise be deemed a permissible exercise of fundamental rights. Where such illegality consists of violation of settled public policy, as well as in other cases of illegal conduct, the injured party has a right to be protected from the imminent harmful consequence of such action."

As we have heretofore pointed out, defendants have not denied that detriment has resulted and will continue to result to plaintiffs' business in the manner and to the extent alleged in the complaint and supporting affidavit. Nevertheless they argue that even though there has been and will be restraint there is no remedy available to plaintiffs for the reason that they, the unions, are seeking only to obtain uniform working hours for all employees. They say that it must be demonstrated from the face of the contract or from the pleadings of plaintiffs that the purpose of the provisions of the contract is to "directly, intentionally and specifically" unreasonably and illegally restrain trade in a way which is unconcerned with the accomplishment of a legitimate labor objective or the contract cannot be deemed an illegal restraint of trade. This is to claim, in effect, that whenever their efforts are calculated to advance the interests of their members the effect upon others is not to be considered. This contention has frequently been advanced and rejected. If we were to agree with it, the result would be that the assertion of any lawful labor objective, regardless of the means proposed for the accomplishment thereof, would preclude the courts from making inquiry to determine whether the objective was indeed lawful.

In *Giboney* v. *Empire Storage & Ice Co.,* 336 U.S. 490 [69 S.Ct. 684, 93 L.Ed. 834], the union argued that the primary objective of their combination and picketing was to improve

wage and working conditions, admittedly a lawful purpose, and that "their violation of the state anti-trade restraint laws must be dismissed as merely incidental to this lawful purpose." The court said, quoting from *International Harvester Co. v. Missouri*, 234 U.S. 199, 209 [34 S.Ct. 859, 58 L.Ed. 1276], " 'It is too late in the day to assert against statutes which forbid combinations of competing companies that a particular combination was induced by good intentions . . . .' " It was also said that "To exalt all labor union conduct in restraint of trade above all state control would greatly reduce the traditional powers of states over their domestic economy and might conceivably make it impossible for them to enforce their anti-trade restraint laws." The courts of this state have held that the letter and paramount object of the law (Cartwright Act) is satisfied if the tendency of the action or proposed action is to restrain trade. (*People v. Sacramento Butchers' Protective Assn.*, 12 Cal.App. 471 [107 P. 712]; *Overland Pub. Co. v. H. S. Crocker Co.*, 193 Cal. 109 [222 P. 812].)

█ Defendants also argue that only those combinations are in unlawful restraint of trade which seek to control prices and create a monopoly. A complete answer to this contention is found in the statute itself. Under subdivisions (a), (b) and (c), of section 16720, Business and Professions Code, it is unlawful for two or more persons to combine to create or carry out restrictions in trade or commerce; to limit or reduce the production of any commodity; or to prevent competition in the sale or purchase of merchandise, produce or any commodity. These enactments are distinct from the remainder of the section which has to do with price fixing. Although price fixing and monopolistic practices tend to affect competition, production and restrictions in trade, the Legislature has not limited illegal combinations in restraint of trade to those which involve price fixing or monopoly. (*People v. Sacramento Butchers Protective Assn., supra.*)

██ Defendants' final contention is that plaintiffs may not have an injunction against the parties to the contract. Their argument is threefold: (1) That plaintiffs are strangers to the contract and are not entitled to injunctive relief; (2) that there is no right to injunctive relief under general equitable principles; and (3) that the Legislature in giving to an injured person the right to recover twofold damages has impliedly withdrawn the right to equitable relief.

We find no merit in the first point. As to the second, section

526, Code of Civil Procedure, provides in part as follows: "An injunction may be granted in the following cases: 1. When it appears by the complaint that the plaintiff is entitled to the relief demanded, and such relief, or any part thereof, consists in restraining the commission or continuance of the act complained of, either for a limited period or perpetually; . . . 4. When pecuniary compensation would not afford adequate relief; 5. Where it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief; 6. Where the restraint is necessary to prevent a multiplicity of judicial proceedings; . . ." These provisions summarize long established principles of equity. They encompass the rule stated by the Supreme Court of Georgia that "A court of equity will intervene by injunction to prevent the several members of an illegal combination from enforcing an agreement to the hurt and injury of one engaged in a competitive business. (*Employing Printers' Club* v. *Doctor Blosser Co.*, 122 Ga. 509 [50 S.E. 353, 106 Am.St.Rep. 137, 2 Ann. Cas. 694, 69 L.R.A. 90].) The courts have applied the rule whenever necessary to protect lawful business from the destructive tendencies of conduct inspired by illegal combinations. (*Schwartz* v. *Laundry & Linen Supply Drivers' U.*, 339 Pa. 353 [14 A.2d 438] ; *Dothan Oil Mill Co.* v. *Espy*, 220 Ala. 605 [127 So. 178] ; *Tallahassee Oil & Fertilizer Co.* v. *H. S. & J. L. Holloway*, 200 Ala. 492 [76 So. 434] ; *Reeves* v. *Decorah Farmers Co-operative Society*, 160 Iowa 194 [140 N. W. 844, 44 L.R.A.N.S. 1104] ; *Burke Transit Co.* v. *Queen City Coach Co.*, 228 N.C. 768 [47 S.E.2d 297] ; *Northern Wisconsin Cooperative Tobacco Pool* v. *Bekkedal*, 182 Wis. 571 [197 N.W. 936] ; *Jackson* v. *Stanfield*, 137 Ind. 592 [36 N.E. 345, 37 N.E. 14, 23 L.R.A. 588] ; *Brown* v. *Jacobs Pharmacy Co.*, 115 Ga. 429 [41 S.E. 553, 90 Am.St.Rep. 126, 57 L.R.A. 547] ; see, also, Walsh on Equity, p. 259.)

One need only consider the facts to realize that if the proposed contract is executed by the parties thereto, plaintiffs' businesses will be adversely affected in such a way that damages would be extremely difficult, if not impossible, to ascertain. The public interest would also be adversely affected. Plaintiffs' business, that of preparing and freezing meats, poultry and fish for the market, is one of very recent origin and anything tending to restrain the sale thereof will also impede progress and advancement in that field. The relief which plaintiffs seek here is protection against the threatened destruction of their businesses. If defendants' conduct in

executing the proposed contract is wrongful by reason of the statute (Bus. and Prof. Code, § 16720), as we have decided it is, the plaintiffs should not be required to accept the inadequate relief of money as a substitute for cessation of the wrongful acts which are destructive of their businesses. (Code Civ. Proc., § 526.) The injunction cases cited all recognize that in such situations equity will intervene because damages would furnish an inadequate remedy and also to prevent a multiplicity of suits.

The final contention is that the right to equitable relief has been withdrawn by the code (Bus. & Prof. § 16750). It provides specifically that ''Any person who is injured in his business or property by reason of anything forbidden or declared unlawful by this chapter'' may sue and recover twofold any damages sustained by him. Inasmuch as we have decided that plaintiffs are injured persons within the meaning of the section, it becomes necessary to decide whether the Legislature intended to exclude the right to injunctive relief because it expressly gave such an injured person the right to sue for and obtain twofold the damages suffered by him. In this connection it is unnecessary to discuss the cases cited by defendants in which injunctive relief to an injured party was denied upon the ground that the statutes under consideration limited the right to such relief to the state in actions brought on its behalf. We are of the opinion that no such result was intended in the enactment of our statutory law. The case of *Orloff* v. *Los Angeles Turf Club,* 30 Cal.2d 110, 113, 114 [180 P.2d 321, 171 A.L.R. 913], directly supports this view. In that case plaintiff's action was based upon the civil rights statutes (Civ. Code, §§ 51, 52, 54), in which it is provided that anyone denied certain privileges, except for reasons applicable alike to every race and color, may sue for and recover damages of not less than $100. One of the questions presented for determination was whether the statute (Civ. Code, § 54), because it provided for damages, impliedly excluded the right to injunctive relief. The court held that it did not and, in answer to the contention that the remedy of damages provided by the state was exclusive, quoted section 4 of the Civil Code: ''The rule of the common law, that statutes in derogation thereof are to be strictly construed, has no application to this code. The code establishes the law of this state respecting the subjects to which it relates, and its provisions are to be liberally construed with a view to effect its objects and to promote justice.'' The court also stated that a factor of

importance in interpreting the statute and in applying the above mentioned common law rule of statutory construction is the adequacy of the remedy provided in the statute and that it should not apply when the remedy given by the statute is inadequate. It is clearly apparent that the remedy given by the statute is inadequate in the instant case and just as apparent that the situation is one which justifies the intervention of a court of equity.

No other points are urged which require further discussion.

The attempted appeal from the order overruling defendants' demurrer is dismissed; the order granting a preliminary injunction is affirmed.

Wood, (Parker), J., and Vallée, J., concurred.

A petition for a rehearing was denied September 20, 1950, and appellants' petition for a hearing by the Supreme Court was denied October 23, 1950. Gibson, C. J., and Traynor, J., voted for a hearing.