[Civ. No. 5830. Fourth Dist. Sept. 26, 1958.]

ALFRED M. LEWIS, INC. (a Corporation), Appellant, v. WAREHOUSEMEN, TEAMSTERS, CHAUFFEURS AND HELPERS LOCAL UNION NUMBER 542 (an Unincorporated Association) et al., Respondents.

774

Hillyer & Crake and Oscar F. Irwin for Appellant.

McLaughlin & Casey, James A. McLaughlin, Edmund G. Brown, Attorney General, and Wallace Howland, Assistant Attorney General, as Amici Curiae on behalf of Appellant.

Donnelley, MacNulty & Butler, Luce, Forward, Kunzel & Scripps and Walter Wencke for Respondents.

COUGHLIN, J. pro tem.*—Action for injunction and damages.

Alfred M. Lewis, Inc., and Rideout Produce Company, corporations, are produce dealers in San Diego, California. Alfred M. Lewis, Inc., is engaged in interstate business, operating grocery stores in many states.

Shortly before May 3, 1956, the Rideout company agreed to service certain produce accounts of the Lewis company. At this time the Rideout company, together with other corporations and individuals engaged in the wholesale produce busi-

*Assigned by Chairman of Judicial Council.

ness, were members of an unincorporated association known as the San Diego Fresh Fruit and Vegetable Dealers Association (hereinafter referred to as the "Association"). Among other things, the purpose of the Association was to act as a collective bargaining unit on behalf of its members with labor organizations, including the Warehousemen, Teamsters, Chauffeurs and Helpers Local Union Number 542 (hereinafter referred to as the "Union"). This Union was an unincorporated association affiliated with the International Teamsters Brotherhood of America. As a bargaining unit, the Association concerned itself with the negotiation of contracts respecting wages and hours of persons employed by its members in order to effect a uniformity of agreements between them concerning these matters.

When the Lewis company and the Rideout company joined forces they entered into competition with the other members of the Association, who became apprehensive and, by reason thereof, the Association "entered into an understanding and arrangement with the Union and its . . . officers, wherein and whereby . . . Rideout Produce Co. was to be excluded from the collective bargaining arrangement theretofore existing" and the "Union was to demand from" the Lewis company and the Rideout company an "increase in wages sufficient to render competition with" the Association's "produce dealers unprofitable." Thereupon, the Rideout company was excluded from the mutual wage agreement in which it had participated with the other members of the Association, and the Union demanded that it execute an agreement for the payment of higher wages. This demand was met and an agreement executed accordingly, which, with some modification, continued until April 1, 1957. In the meantime, the Rideout and Lewis companies had changed their agreement, to the end that the former rented a portion of its facilities and equipment to the latter, which also took over a number of the Rideout company's employees.

In April, 1957, in furtherance of its agreement with the Association, the Union demanded that the Lewis and Rideout companies execute contracts for wages sufficiently in excess of those paid by the Association's produce dealers as to render competition with those dealers unprofitable, and, upon refusal of this demand, declared a strike and placed a picket line around the Rideout company's place of business, which was the same place of business for the Lewis company. Thereupon, the two companies brought this action against the Union and

the Association to enjoin the strike and the picketing and to recover damages allegedly sustained as a result thereof.

Joined as defendants were certain specifically named officers and agents of the Union, specifically named members of the Association, and a great number of fictitiously named individuals, partners and corporations. The complaint alleges that the Union has numerous members; that it is impracticable to bring all of said members into the action as defendants; that most of their names are unknown; and that, for these reasons, the individual members of the Union are made parties defendant and charged with defending the action for the benefit of all other members of the Union. The answers on file, together with the recitals in the findings and judgment, indicate that only those defendants specifically named in the complaint appeared in this action.

The case was tried by the court without a jury. The facts heretofore set forth appear in the findings prepared and signed by the trial judge. In addition, the court specifically found: ''That the agreement and arrangement between defendant Local 542 and its defendant officers and defendant produce dealers and the acts done pursuant thereto as aforesaid, were for the purpose of intending to affect and restrict competition in the distribution of fresh fruits and produce in the city of San Diego and the immediately surrounding area.''

From the facts as found the court concluded that the agreement between the defendants ''would be in violation of the antitrust laws of the State of California if involving local businesses not engaged in interstate commerce or which affected interstate commerce''; that ''jurisdiction of the controversies involved between the plaintiffs and the defendants is vested solely in the National Labor Relations Board''; that ''under the National Labor Relations Act the right to strike is guaranteed to defendant labor union . . . and the right thus made legal by the laws of the United States may not be made illegal by the antitrust laws of the State of California''; that the agreement between the defendants ''being not unlawful under the laws of the United States'' does not constitute a conspiracy; and that ''judgment should be rendered against the plaintiffs.''

A judgment in favor of the defendants and against the plaintiffs was rendered accordingly, from which the plaintiff Alfred M. Lewis, Inc. appealed on the judgment roll alone, although after the filing of the clerk's transcript on appeal, pursuant to stipulation of all parties, a reporter's transcript

was prepared and, after petition for permission to do so, was filed in this court. From a statement contained in the brief on file it appears that following entry of judgment, the plaintiff Rideout Produce Company dismissed its action with prejudice.

Appellant contends that the trial court erred in drawing the conclusions of law heretofore noted from the facts as found.

Respondents contend that the evidence does not support the trial court's finding of an agreement between them in restraint of trade; that the trial court did not have jurisdiction over any dispute involving either of them; that the Labor Management Relations Act, the National Labor Relations Act, the Sherman Antitrust Act, and other federal legislation has preempted the field of law governing any of the controversies in this case; and that the trial court failed to find upon material issues presented by the pleadings.

■ Although " 'It is well settled that parties who have not appealed cannot attack the findings' " (*Henigson* v. *Bank of America,* 32 Cal.2d 240, 244 [195 P.2d 777]), and that errors affecting such parties will not be reviewed on appeal (*Salter* v. *Ulrich,* 22 Cal.2d 263, 268 [138 P.2d 7, 146 A.L.R. 1344]), nevertheless, under the authority of *Mott* v. *Horstmann,* 36 Cal.2d 388, 393 [224 P.2d 11], the respondents urge this court to affirm the judgment on the ground that there is no evidence to sustain the finding that they entered into an agreement to force appellant out of business; that the judgment is proper because there is no valid finding to support a contrary judgment; and "that an erroneous reason should be disregarded if the decision is correct." (*Mott* v. *Horstmann, supra,* 36 Cal.2d 388, 393.)

■ In determining the sufficiency of the evidence to sustain a questioned finding, the appellate court must accept as true all evidence and all inferences which reasonably may be drawn therefrom tending to support that finding. (*Burke* v. *Chrostowski,* 46 Cal.2d 444 [296 P.2d 545].)

There is no direct evidence of an agreement between the Union and the Association to restrict competition, as set forth in the findings in this case.

The courts have recognized the difficulty attendant upon proof of this kind of an agreement, which the parties in their briefs refer to as a conspiracy. (*Johnstone* v. *Morris,* 210 Cal. 580, 590 [292 P. 970].) Unless one of the conspirators confesses, no direct evidence of such an agreement is available. ■ Consequently, "As a general rule, a conspiracy can be established only by circumstantial evidence." (*People* v.

*Steccone,* 36 Cal.2d 234, 237-238 [223 P.2d 17]; *People* v. *Osslo,* 50 Cal.2d 75, 94 [323 P.2d 397]), and "it is not neces-sary to show that the parties met and actually agreed to undertake the performance of the unlawful acts." (*People* v. *Sampsell,* 140 Cal.App. 431, 438-439 [286 P. 434]; *People* v. *Sorrentino,* 146 Cal.App.2d 149, 159 [303 P.2d 859].)

The evidence in this case furnishes direct proof of facts supporting the inferences drawn by the trial court respecting the existence and purpose of the agreement in question.

For a number of years the Rideout company and other members of the Association operated from places of business located in an area centering around Sixth Street in San Diego. For this reason the dealers were referred to as "The Street." In 1954 the Rideout company moved into more commodious and efficient quarters at another location. This move, how-ever, did not change the relationship existing between this company and other members of "The Street." In 1955, as in previous years, a contract had been negotiated between the Union and the Association acting on behalf of its mem-bers, including the Rideout company. As heretofore noted, the primary purpose of the Association was to assure the same wage scale for each member, which was agreed upon by a majority vote. The 1955 contract covered a term of one year and expired April 1, 1956. At this time the members of the Association, including the Rideout company, agreed to stand together respecting a new contract, so that the wage scale applicable to each of them would be the same.

On May 3, 1956, the Rideout company commenced opera-tions under an agreement with the Lewis company, which is a capital structure, to service the accounts of a cooperative venture known as Orange Empire, sponsored by Lewis. The stores which participated in this "co-op" are independent of the Lewis company and are not required to purchase from or through that company or the "co-op"; but if a profit is made by the "co-op" they will share therein. The Rideout company serviced the Orange Empire accounts on a percentage basis without any change in its operation; it conducted the same kind of business theretofore conducted; its agreement with the Lewis company meant only the acquisition of some addi-tional accounts. Nevertheless, on May 5, 1956, two days after the Rideout company started its new operations, a representa-tive of the respondent Union advised Mr. Rideout, president of the company, that because it was handling some business for the Orange Empire "co-op" it would be treated separately

from other members of the Association; that it no longer could be a member of that Association; and demanded a substantial wage increase. Under threat of a strike called for May 10th and the probable loss of $50,000 worth of fresh fruits and vegetables then on hand, the Rideout company acquiesced in the Union's demands and agreed to pay in accordance with a wage scale half way between that in effect on "The Street" and that in effect with the grocery industry of San Diego.

The Safeway stores in San Diego operated under an agreement whereby it paid its produce truck drivers according to the grocery industry scale. During the course of subsequent negotiations the Union and various members of the Association contended that the Rideout and Lewis companies had "captive accounts," such as did Safeway stores and, for this reason, should be treated differently than the dealers on "The Street." However, neither appellant Lewis company nor the Rideout company had any "captive accounts." ▮ A "captive account" is a customer which has no choice but to accept merchandise from the dealer as offered regardless of quality, amount or need. At times, stores that were members of the Orange Empire "co-op" purchased produce from dealers on "The Street" and not through the "co-op."

Shortly after his discussion with the Union representative, Mr. Rideout was advised by the president of the Association, as well as some of its members, that the matter had been discussed quite thoroughly by the members of "The Street" and the Union; that the membership was in accord with the Union because Rideout had taken on the Orange Empire produce business; and that Lewis should not have been allowed to go into the produce business.

In July, 1956, the agreement between the Rideout company and the Lewis company was changed. Instead of servicing the Orange Empire "co-op" stores, Rideout rented part of its equipment and plant to the Lewis company, which, in turn, serviced these accounts. The Lewis company continued to employ some of the Rideout company's employees at the wages agreed upon by the latter company. On several occasions after this, Rideout had discussions with different members of the Association who stated that they would not stand behind him but would side with the Union. In January, 1957, one of the members asked Rideout if there was anything he, Rideout, could do to get Orange Empire produce out of business in San Diego and suggested that he dispose

of his building to some other industry which would deprive Orange Empire of those facilities.

Some time prior to April 1, 1957, the Union and the Rideout and Lewis companies entered into negotiations concerning a wage contract for that year. Rideout had asked the Association to represent him but this request was refused, even though he was considered a member of the Association. The Union demanded that the two companies pay the same scale as Safeway stores upon the ground that both of them and Safeway stores had "captive accounts." The president of the respondent Association was in accord with the differentiation made by the Union for the same reason. The only difference between the operation of the dealers on "The Street" and that of the Rideout and Lewis companies, which was advanced as a reason for a difference in their classification for wage paying purposes, was the alleged "captive account" difference, which did not exist.

On April 1, which was the renewal date for the contracts under consideration, the dealers on "The Street" were paying $1.80 per hour to their employees. The Union demanded $2.39¼ per hour from the Rideout and Lewis companies for their employees. This demand was rejected; a strike was called and a picket line established. Although the Union representative and members of the Association had stated that a 20 cents an hour increase was being demanded from the dealers on "The Street," no new contract was entered into by them and no strike was called.

In a conference between Mr. Lewis, president of appellant company, Mr. Glore, president of the respondent Association, and Mr. Mercurio, president of Growers Marketing Company, Inc., a member of the Association, it was suggested that Lewis buy out Growers Marketing Company; that if he did so, his troubles with the Union would be over. Lewis accused those present of putting the "tag" on him and they agreed that such was the fact. During the course of the foregoing conversation, in response to a statement by Mr. Mercurio that relations with the Union were peaceful until Lewis came into San Diego, the latter made this accusation: "You're the birds that did this. We didn't." Neither Mr. Mercurio nor Mr. Glore made any reply.

The evidence justifies the conclusion that the Rideout or Lewis companies cannot compete with respondent dealers if required to operate under the differential in wage scale de-

manded by the Union, which controls the labor market essential to their operations.

The foregoing facts legally sustain the trial court's conclusion that respondents entered into an agreement to restrict competition by establishing a wage differential between appellant and respondent dealers which would make it unprofitable for appellant to compete with those dealers.

By this agreement, and the circumstances attendant thereupon, appellant had the choice either to accept the Union's demands made pursuant thereto, pay the higher wages and be forced out of the produce business by losses and a lack of profit; or to refuse to pay the higher wages and be forced out of business by a lack of labor and other detrimental consequences resulting from the Union's strike and picketing.

The agreement and the conduct of respondents pursuant thereto was in violation of the Cartwright Act which declares unlawful any "combination of capital, skill or acts by two or more persons" (including associations and corporations) for "The purpose of creating or carrying out restrictions in trade or commerce" or "to prevent competition" in the "sale or purchase of merchandise, produce or any commodity." (Bus. & Prof. Code, §§ 16720, 16726; *Speegle* v. *Board of Fire Underwriters,* 29 Cal.2d 34, 40-42 [172 P.2d 867]; *Caruso* v. *Abbott,* 133 Cal.App.2d 304, 307 [284 P.2d 113]; *Alpha Beta Food Markets, Inc.* v. *Amalgamated Meat Cutters,* 147 Cal.App.2d 343 [305 P.2d 163]; *Kold Kist, Inc.* v. *Amalgamated Meat Cutters,* 99 Cal.App.2d 191, 201 [221 P.2d 724].)

In *People* v. *Sacramento Butchers' Protective Assn.,* 12 Cal. App. 471, 481 [107 P. 712], where an association of meat dealers and a meat distributing company were charged with entering into a combination to destroy competition in the retail meat business, in violation of the Cartwright Act, because they had agreed to require a named meat dealer to pay a higher price for meat than was required of members of the association, the court said:

". . . [t]he object of the statute is to prevent such combinations or conspiracies between persons engaged in a particular line of business as will destroy free competition therein, and if the purpose of such combination is to restrict trade or destroy competition in the sale and purchase of 'merchandise, produce, or any commodity,' or if such combination tends to restrict trade or to prevent competition therein, such

combination is against the letter and paramount object of the law.''

If Lewis were forced out of the San Diego produce market, obviously any advantage in price or service which that company might offer buyers in that market would be eliminated.

■ A violation of the Cartwright Act may be the basis of an action to recover damages for injury sustained as a result thereof and for injunctive relief. (Bus. & Prof. Code, § 16750; *Kold Kist, Inc.* v. *Amalgamated Meat Cutters, supra,* 99 Cal.App.2d 191; *O'Shea* v. *Tile Layers Union,* 155 Cal. App.2d 373 [318 P.2d 102].)

The trial court determined, as expressed in its conclusions of law, that the agreement in question would have been in violation of the Cartwright Act if it involved ''local businesses not engaged in interstate trade or which affected interstate commerce,'' but that because appellant was engaged in interstate commerce, the laws of the United States apply; that under those laws the agreement was not unlawful and, consequently, did not constitute a conspiracy. Integrant to this conclusion is the belief of the trial judge, as expressed in his summation at the conclusion of the trial, that an actionable conspiracy involves an agreement to do an unlawful act resulting in damage; that, unless the act resulting in damage is unlawful, independent of the conspiracy, no cause of action exists, even though the purpose of the conspiracy was to effect such damage; that the damage of which appellant complains resulted from the strike and the picketing invoked by the Union; that, as expressed in his conclusions of law, ''under the National Labor Relations Act the right to strike is guaranteed to defendant labor union'' and ''the right thus made legal by the laws of the United States may not be made illegal by the antitrust laws of the State of California''; consequently, the conspiracy in question was not actionable.

■ Under the Cartwright Act and similar antitrust legislation, the combination for a particular purpose constitutes the unlawful act. (*People* v. *Sacramento Butchers' Protective Assn., supra,* 12 Cal.App. 471, 484; *Nash* v. *United States,* 229 U.S. 373 [33 S.Ct. 780, 782, 57 L.Ed. 1232]; *United States* v. *Trenton Potteries Co.,* 273 U.S. 392, 402 [47 S.Ct. 377, 381, 71 L.Ed. 700, 50 A.L.R. 989].)

■ The prohibited combination comes into being through an agreement of two or more persons for the purpose of restraining trade or preventing competition. Conduct used to effect such an agreement may result in actionable damages

or be the subject of an injunction, even though such conduct if not used to effect the agreement would be lawful.

In the field of labor litigation it has been recognized that a strike may be lawful or unlawful, depending upon whether the primary objective or purpose for calling the strike is lawful or unlawful. As a consequence, in those instances where the primary purpose of a strike is to restrain trade, even though the working conditions of striking employees may be advanced as an incident to the accomplishment of the primary purpose, the strike will be enjoined as unlawful. (*Giboney* v. *Empire Storage & Ice Co.*, 336 U.S. 490 [69 S.Ct. 684, 93 L.Ed. 834]; *Kold Kist, Inc.* v. *Amalgamated Meat Cutters, supra*, 99 Cal.App.2d 191.) "(t)he real test in a particular case is the primary purpose of the agreement or combination in question." (*Schweizer* v. *Local Joint Executive Board*, 121 Cal.App.2d 45, 53 [262 P.2d 568].)

Under circumstances such as those in the case at bar, the determination of the primary purpose of such an agreement is a question of fact. The findings in this case establish that the purpose of the strike in question was to effect an agreement to destroy competition.

The Union contends that, as the trial court did not find the strike was called *only* for the purpose of effecting the agreement to destroy competition, a coincident labor purpose must be assumed because of the demand for an increase in wages. A reasonable interpretation of the findings does not justify this assumption. The court found that the agreement between respondents "and the acts done pursuant thereto as aforesaid, were for the purpose of intending to affect and restrict competition in the distribution of fresh fruits and produce in the city of San Diego." To accept respondents' contention would require a trial court to negate all facts which might limit the inclusive nature of a positive finding. This is unreasonable. "(I)f the findings of fact made by the trial court leave some issue or material fact undetermined, such issue of fact will be regarded as not proved by the party having the burden of proof" (53 Am.Jur. 796), unless such fact be implied in the findings made. (*Haigler* v. *Donnelly*, 18 Cal.2d 674, 678 [117 P.2d 331].) The contention advanced must be rejected.

The conclusions of law drawn by the trial court focus attention upon the application of federal legislation to this case. Interrelated, and equally pertinent, are inquiries concerning the jurisdiction of the state court, the legality of the trans-

action under consideration, whether it primarily involves a labor dispute or a restraint of trade, the interstate nature thereof, and its effect upon the Cartwright Act.

If the Labor Management Relations Act applies, the state court has no jurisdiction in the premises, except as the facts may establish a cause of action under state law for damages based upon a tort. (*San Diego Bldg. Trades Council* v. *Garmon*, 353 U.S. 26 [77 S.Ct. 607, 609, 1 L.Ed.2d 618] ; *Garmon* v. *San Diego Bldg. Trades Council*, 49 Cal.2d 595 [320 P.2d 473].)

The Labor Management Relations Act, which includes the National Labor Relations Act, governs labor disputes, unfair labor practices, and the concerted activity of employees for their mutual aid or protection affecting interstate commerce. Under the findings of the trial court, the controversy in this case does not involve a labor dispute, an unfair labor practice, or an activity of the employees for the purpose of mutual aid and protection. Any labor objective present was incidental to the accomplishment of respondents' primary purpose, which was to eliminate appellant's competition with other produce dealers. If the Union had agreed to forbid its members to work for appellant, in order to effect the purpose of the combination under consideration, the nonapplicability of the Labor Management Relations Act would be unquestioned. The method used to effect such purpose, by demanding a prohibitive wage rate, calling a strike, and invoking a picket line, while more subtle, although no less effective, did not change the fundamental nature of the transaction. Likewise if the Lewis company had acquiesced in the Union's demand, accepted the higher wage scale, determined that the venture was unprofitable, went out of business, and then sued for damages, no labor dispute, unfair labor practice, or mutual aid and protection activity would be an issue in such an action. These examples are used merely to point up the primary purpose of the conduct in question, which was to prevent competition, not to obtain a higher wage scale.

The numerous arguments advanced by respondent Union categorize the charges made against it within well defined unfair labor practices; relate facets of the negotiations and the contentions between it and the Rideout and Lewis companies to acceptable definitions of a labor dispute; advance investigative and administrative reasons for placing exclusive jurisdiction over these matters in the National Labor Relations Board; and urge that employees are given rights by

section 7 of the Labor Management Relations Act which should not be taken from them in an action such as the one at law. (29 U.S.C. § 157.) In each instance, these arguments omit any consideration of the trial court's finding that the activities in question were engaged in "pursuant to" an agreement prohibited by the Cartwright Act, "in furtherance thereof," and "for the purpose" of eliminating appellant as a competitor of respondent dealers.

The Labor Management Relations Act neither prohibits nor protects the activity of a union in aiding and abetting a nonlabor group to destroy its competitor. (See generally *Weber* v. *Anheuser-Busch,* 348 U.S. 468 [75 S.Ct. 480, 99 L.Ed. 546].)

The combination between respondents was not protected by the exclusionary provisions of the federal antitrust laws which apply to a union engaged in labor activities; nor was the the Union, by federal law, "guaranteed" the right to strike to effect the purpose of that combination. (*Allen Bradley Co.* v. *Local Union No. 3,* 325 U.S. 797, 807 [65 S.Ct. 1533, 1539, 89 L.Ed. 1939]; *United States* v. *Hutcheson,* 312 U.S. 219, 232 [61 S.Ct. 463, 466, 85 L.Ed. 788].)

In *Allen Bradley Co.* v. *Local Union No. 3, supra,* 325 U.S. 797, 808 [65 S.Ct. 1533, 1539, 89 L.Ed. 1939], the court said that ". . . Congress never intended that unions could, consistently with the Sherman Act, aid non-labor groups to create business monopolies and to control the marketing of goods and services."

Consequently, when a union combines with a non-labor group in restraint of trade its activities are subject to the same federal antitrust laws as are those of the nonlabor group, even though in so doing, its purpose is to further the interest of its members as wage earners. (*Allen Bradley Co.* v. *Local Union No. 3, supra,* 325 U.S. 797 [65 S.Ct. 1533, 89 L.Ed. 1939]; *United Brotherhood, C. & J.* v. *United States,* 330 U.S. 395, 400 [67 S.Ct. 775, 778, 91 L.Ed. 973]; *Las Vegas Merchant Plumbers Assn.* v. *United States,* 210 F.2d 732, 751.)

The trial court's conclusion of law that "the right to strike is guaranteed to defendant labor union" undoubtedly refers to the statutory expression of the anti-injunction policy of the federal government concerning strikes contained in the Clayton, and Norris-LaGuardia Acts (29 U.S.C. §§ 52, 101, 104), or the "right which Congress had guaranteed under section 7 of the Taft-Hartley Act—the right to strike peacefully to enforce union demands for wages, hours and working

conditions." (*Weber* v. *Anheuser-Busch, supra,* 348 U.S. 468, 475 [75 S.Ct. 480, 485, 99 L.Ed. 546].) As heretofore noted, the activity protected by this legislation does not extend to combinations between labor and nonlabor groups in restraint of trade.

■ The National Labor Relations Act does not guarantee a right to strike. The provisions of this statute simply direct that nothing therein contained "except as specifically provided for herein, shall be construed as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right." (29 U.S.C. § 163.)

It is our conclusion that the Union's conduct in question was not a subject of federal legislation; that state law governs; and the determination of the trial court to the contrary was error.

Nothing in this opinion should be taken as indicating that the trial court had jurisdiction to enjoin the respondent union from calling a strike or invoking a picket line for the primary purpose of attaining a lawful labor objective, as distinguished from calling such strike or enjoining such picket line for the primary purpose of effecting the unlawful agreement between it and respondent dealers to destroy competition. Caution must be exercised in defining the scope of any such injunction. (*Park & T. Import Corp.* v. *International etc. of Teamsters,* 27 Cal.2d 599, 607 [165 P.2d 891, 162 A.L.R. 1426] ; *O'Shea* v. *Tile Layers Union, supra,* 155 Cal. App.2d 373, 378.)

Besides contending that the case at bar is one concerning a labor activity subject to the exclusive jurisdiction of the National Labor Relations Board, it also is contended that the federal government has preempted the field of legislation respecting transactions involving restraints on trade in interstate commerce; that the Sherman Anti-Trust Act, 15 U.S.C. §§ 1 et seq.; Clayton Act, 15 U.S.C. §§ 12 et seq.; and Federal Trade Commission Act, 15 U.S.C. §§ 41 et seq. are controlling; and that any relief thereunder must be sought in the federal courts or other federal agency. The federal acts in question together implement a policy against restraints on trade.

■ The record discloses that although appellant's grocery business involved interstate commerce, consisting in the operation of grocery stores in several states, the only produce business it operated was in San Diego. Whether the activities under consideration in this case occurred in or substan-

tially affected interstate commerce was a question of fact not covered by the general finding that appellant "is engaged in interstate commerce." Even though a company is engaged in interstate commerce, a particular activity or part of its business may be intrastate in character, not occurring in or substantially affecting commerce within the realm of the federal antitrust laws. (*United States* v. *South-Eastern Underwriters Assn.*, 322 U.S. 533, 548 [64 S.Ct. 1162, 1171, 88 L.Ed. 1440] ; *Chas. H. Benton, Inc.* v. *Painters Local Union*, 45 Cal.2d 677, 682-683 [291 P.2d 13].) See also *Las Vegas Merchant Plumbers Assn.* v. *United States, supra*, 210 F.2d 732. However, for the purposes of this discussion it will be assumed that the activities in question are within the sphere of the commerce clause of the federal Constitution.

 The fact that Congress has acted to prevent restraints on trade in interstate commerce, of itself, does not invalidate legislation by a state effecting substantially the same result. The fundamental inquiry in such instances is whether the state legislation is in conflict with national policy. (*State of California* v. *Zook*, 336 U.S. 725, 729 [69 S.Ct. 841, 843, 93 L.Ed. 1005].)

In *Speegle* v. *Board of Fire Underwriters, supra*, 29 Cal.2d 34, 49-50 [172 P.2d 867], the application of the Cartwright Act to interstate insurance transactions was sustained. The court said, page 51:

"The fact that the Sherman Act is applicable to such practices (i.e. restraints of competition involving boycott, coercion or intimidation) does not mean that the state law concerning restraints of commerce in the insurance field is invalidated as to such activities and agreements involving such practices. . . . Since there is no conflict between the law of this state and the Sherman Act, plaintiff may invoke the state law even if interstate commerce is involved."

 The opinion in the foregoing case refers to a general rule expressed by the Supreme Court of the United States that " 'State laws are not invalid under the Commerce Clause unless they actually discriminate against interstate commerce or conflict with a regulation enacted by Congress.' " (*Speegle* v. *Board of Fire Underwriters, supra*, 29 Cal.2d 34, 50.)

 In the field of labor management relations affecting interstate commerce, although congressional action has preempted the jurisdiction of a state court "to grant equitable relief in the solution of labor disputes," it has not foreclosed such a court "from asserting jurisdiction in an action

for damages resulting from the tortious conduct of those engaged in the dispute.'' (*Garmon* v. *San Diego Bldg. Trades Council, supra,* 49 Cal.2d 595, 602; *San Diego Bldg. Trades Council* v. *Garmon, supra,* 353 U.S. 26 [77 S.Ct. 607, 609, 1 L.Ed.2d 618].) In *Weber* v. *Anheuser-Busch, Inc., supra,* 348 U.S. 468, 476 [75 S.Ct. 480, 486, 99 L.Ed. 546], the Supreme Court refers to a number of instances where the courts held that the federal enactments had not exclusively absorbed the authority of the state with respect to labor activities.

''In those cases where the Supreme Court has held that exclusive jurisdiction is vested in the National Labor Relations Board it appears without question that the basis of the decisions is the desirability of avoiding such a conflict between state and federal policies and procedural remedies as would result in an interference with uniform enforcement of federal act.'' (*Garmon* v. *San Diego Bldg. Trades Council, supra,* 49 Cal.2d 595, 603.) No need for federal legislation appears in order to effect uniformity of policy or enforcement thereof against restraints on trade.

The validity of a state statute regulating interstate transportation, containing provisions substantially the same as those of a federal act, was upheld by the Supreme Court of the United States, even though the conduct prohibited by such laws might be punishable as an offense against both the federal and state governments. (*State of California* v. *Zook, supra,* 336 U.S. 725 [69 S.Ct. 841, 93 L.Ed. 1005].) The court said (p. 730):

''If state laws on commerce are identical with those of Congress, the court may find congressional motive to exclude the States . . . But the fact of identity does not mean the automatic invalidity of State measures. Coincidence is only one factor in a complicated pattern of facts guiding us to congressional intent.''

and further, (p. 733)

''The question is whether Congress intended to override State laws identical with its own when it, through the Interstate Commerce Commission, regulated share-expense passenger automobile transportation, or whether it intended to let State laws stand. While the statute says nothing expressly on this point and we are aided by no legislative history directly in point, we know that normally congressional purpose to displace local laws must be clearly manifested. (Citing cases.)''

"The Cartwright Act merely articulates in greater detail a public policy against restraint of trade that has long been recognized at common law." (*Speegle* v. *Board of Fire Underwriters, supra,* 29 Cal.2d 34, 44 [172 P.2d 867].) Such a legislative enactment is within the tradition of the "usual police powers" of the state, referred to in the Zook case as an aid in determining congressional intent. (*State of California* v. *Zook, supra,* 336 U.S. 725, 734 [69 S.Ct. 841, 846, 93 L.Ed. 1005].) The act is not in conflict with federal policy or law. To the contrary, in this area, the objective of each entity of government is the same. The state seeks to protect its citizens and the national government seeks to protect interstate commerce from a long recognized unlawful activity.

In *Parker* v. *Brown,* 317 U.S. 341, 367 [63 S.Ct. 307, 321, 87 L.Ed. 315], the validity of the California Agricultural Prorate Act was under consideration. The program sponsored by the act "was not aimed at nor did it discriminate against interstate commerce, although it undoubtedly affected the commerce by increasing the interstate price of raisins and curtailing interstate shipments to some undetermined extent." The court said (p. 368) :

"It thus appears that whatever effect the operation of the California program may have on interstate commerce, it is one which has been the policy of Congress to aid and encourage through federal agencies . . . Hence we cannot say that the effect of the state program in interstate commerce is one which conflicts with congressional policy or is such as to preclude the state from this exercise of its reserved power to regulate domestic agricultural production."

Although the court was not considering a situation where similar legislation had been enacted by Congress, the principles advanced in considering the validity of the state statute, even though it affected interstate commerce, are pertinent to a consideration of the factual situation at bar.

As there is no conflict between the state and federal policies encompassed by the legislation under consideration; no conflict between the state and federal acts; no need for a single statute to effect uniformity of policy or procedure; the local law is within the tradition of "the usual police powers" of the state; and Congress has not indicated its intent to preempt the field, it is our opinion that the Cartwright Act may be applied to the situation at bar in the state courts.

Respondent union has made various contentions concerning

the lack of findings with respect to alleged material facts. These come within the rule heretofore noted, that claims of error affecting parties who have not appealed will not be reviewed. Upon a retrial of the issues in this case the trial court may consider these contentions according to the law and the facts in the premises.

The judgment is reversed and the case is remanded for a new trial.

Griffin, P. J., and Mussell, J., concurred.