THOMAS, A MINOR, ETC., PLAINTIFF, *v.* DRAIN, DEFENDANT.

Common Pleas Court, Franklin County.

No. 213916. Decided May 12, 1964.

*Mr. Morton Y. Reeves*, for plaintiff.
*Messrs. Dresbach, Crabbe, Newlon & Bilger*, by *Mr. Wilbur W. Jones*, of counsel, for defendant.

SATER, J. Plaintiff Robert is the second of three children of Mr. and Mrs. Orville Thomas; his sister Donna is a year or two older, his brother is younger. Of the three, Donna was concededly "the boss." Their home at the times pertinent herein, was in the Hanford Village area in the southeastern portion of metropolitan Columbus. Mr. and Mrs. Thomas were members of a church located on East Long Street, also in Columbus proper. However, for several years they had sent their three children to morning Sunday School at the Church of God in Christ which was located just a few doors away from the Thomas home on the same street. Then when the children returned from Sunday School, they would all five attend the adult Sunday morning service of the church of their membership; they were not members of and never had attended this neighborhood church.

On Sunday morning March 12, 1961, the three Thomas children went off to Sunday School in the pattern described just above. However, on that particular morning there was held a state-wide convocation of all 17 Churches of God in Christ in the member church building located at or near the intersection of Mt. Vernon and Cleveland Avenues in this city. The convocation included full morning church and Sunday School services. Concededly handbills advertising this convocation had been circulated among the participating member churches, including the one attended by the Thomas children. Mrs. Thomas testified that a neighbor told her that the group was going elsewhere to Sunday School that morning but there is no evidence that any of the handbills had come to her or to her attention.

When, or soon after the Thomas children arrived at the church of their neighborhood Sunday School service, several passenger automobiles were at the curb waiting to take all participating children to the centralized church of the state convocation. Sister Donna may have entered the church that morning; plaintiff Robert did not. But we consider it immaterial whether some or all of the Sunday School children had, or had not, entered the church edifice before they were instructed to get into the automobiles waiting at the curb. Suffice it to say that the Sunday School superintendent, a Mrs. Garner of that church, told the children to get into the waiting automobiles and be taken to the state convocation. If she told them which cars to enter, there is nothing to indicate that she did more than designate which cars were going to the convocation and which ones not.

For the purpose of meeting this transportation need, the neighborhood church had canvassed its membership, and had come up with five or six automobile-owning members who volunteered their facilities and services to this need. Defendant Drain, who appeared to be on the sunny side of forty, was one of these. His young daughter was a member of the Sunday School group and was attending the state convocation; she was being driven there in her father's car and in a spirit of Christian participation he had agreed to transport her and then watch the united Sunday School service himself. Consequently and in the same spirit it was natural for him to agree to take along such other youngsters as he could. He did not know the

Thomas children or their parents, nor did the parents know him. Admittedly, he received no monetary consideration or other thing of temporal value from anyone for his action; nor did any advantage of any sort accrue to him therefrom; he did not know who was to ride with him, and who was not. He was simply "trying to help."

Defendant Drain's car was the first in the line of those waiting at the curb with his daughter and himself seated in it. He did not ask or invite the Thomas children or any other particular children to ride with him; he simply provided facility and waited to see who would climb in. The Thomas children did not ask to ride with him; nor did they refuse to do so. The actual embarkation was handled by the Sunday School superintendent; if she allocated particular children to particular cars, nothing before us indicates that such allocation, if any, was other than pure "happenstance" or anything other than an effort to see that no one car was overloaded. When the embarkation was completed, there were seven in defendant Drain's car,—defendant, his daughter, the three Thomas children and two other children. Numerically, this sounds like a lot but when we consider the evidence as to the age and size of the six children, we cannot say that the car was overloaded. Besides defendant, three children were on the front seat and three on the rear; plaintiff Robert was next to defendant Drain. Others had tried to get in but, for stated reasons, had been taken back to the other waiting cars.

Defendant Drain proceeded northwesterly to Mr. Vernon Avenue and intended to drive westward on Mt. Vernon Avenue to its intersection with Cleveland Avenue. Close to the pilgrims' destination, Mt. Vernon Avenue is intersected by St. Clair Avenue which runs north and south. There is a traffic light at this intersection but it was not working that morning. Also, St. Clair Avenue does not cut straight across Mt. Vernon Avenue; its southern reach is a bit to the west of its northern reach. The day was clear and dry, the sun was shining, and the hour was about 10:30 to 10:40 A. M. At no time did defendant Drain drive over twenty miles per hour, and this on a through street. Even plaintiff Robert testified he was going neither slow nor fast.

As defendant Drain approached this intersection from the

east, one Jordon drove north on St. Clair Avenue from the south, intending to cross northward across Mt. Vernon Avenue with a companion en route to Newark, Ohio (an incomprehensible and unexplained route to that city). Admittedly he thought the traffic light was green for him north and south, though actually the light was not functioning at all. Admittedly, he did not stop before entering to see what traffic was moving in any direction on Mt. Vernon Avenue. Admittedly, and even though the intersection "jogged," he did not see defendant Drain's car until a split second before they collided. Beyond that, his testimony was very cloudy, and did nothing to aid the Court. He was sued in the Municipal Court of this city by plaintiff Robert, judgment was rendered against him, but it has proven so far to be uncollectible.

There was one car going westward ahead of defendant Drain and it turned north onto St. Clair Avenue. The evidence leaves doubt whether he slowed down or stopped completely before entering the intersection; in all probability he did no more than slow down to allow the car ahead of him to complete its turn so that he could continue without interruption. Certainly, he first saw the Jordan car at the intersection of Mt. Vernon and St. Clair Avenues. The two cars collided just north of the center of Mt. Vernon Avenue, the front of defendant Drain's car striking the right front of Jordan's car.

Plaintiff Robert struck the windshield and sustained a relatively minor laceration of the nose and a long laceration above both eyes on the bony protuberance just below his eye brows. He was taken to Childrens' Hospital where his lacerations were treated and X-rays showed no fracture. He complained of headaches. After 2½ hours he was released and sent home. Since then he has been treated with fair regularity by Dr. Jefferson who had treated him before the accident. Robert is subject to "seizures" (though their cause is not clear) and has one ruptured ear-drum. No way is known to remove the scars which have not changed much in three years; and whether he will outgrow them "only time will tell." His vision is not affected. The Court examined the lateral scar but did not find it to be repulsively disfiguring.

By his father and next friend, plaintiff Robert has brought

this action, praying for $25,000.00 damages. A jury was waived and the case tried to the Court, thereby placing on the Court the duty of weighing the evidence and testing the credibility of the witnesses. The petition does not allege wilful and wanton negligence, only "ordinary" negligence, and Counsel's opening statement was to the effect that plaintiff Robert was a "captive" in defendant Drain's automobile. Admitting all allegations except negligence, the answer positively alleges he was a guest. The reply denies all that is not admitted. The foregoing discussion we hold to be a fair statement of the controlling facts from the evidence adduced at trial.

The case thus turns on the question: What, under the foregoing findings of fact, was the status of plaintiff Robert in defendant Drain's automobile up to and at the time? Since he was actually in the automobile, was he there a captive as his counsel asserted in opening statement, a passenger, or a guest? Since it must be one of these categories, let us consider them in turn.

We do not and cannot find that plaintiff Robert was a captive. Although we can find no reported Ohio authority on the subject, the whole import of the entire range of verbs and nouns on this subject, e. g., captive, capture, captor, captivity, is the taking, seizing or restraining by force or surprise or strategem against the will or desire of the victim. This is true both legally as well as semantically. In *A. M. Lewis, Inc.* v. *Warehouseman's Local,* 163 Cal. App., 771, 330 Pac. (2d), 53, 58, a "captive" was held to be one who had no choice, who is compelled by some external force to do something whether he wishes to do so or not. *Pollack* v. *Pub. Ult. Com'n.,* D. C., 191 Fed. (2d), 450, 454, "captive" was said to be or include those who are "subjected against their will." The classic illustration of a captive rider is found in our own unreported case *McBride* v. *Burke, Jr.,* No. 2953, wherein the rider was physically, bodily forced into an automobile and driven some distance away from the initial point of contact.

Semantically the result is the same. The Oxford English Dictionary, Vol. II (1933 edition) defines a captive as being "restrained from escaping" (a good illustration might be a captive balloon), and Webster's New International Dictionary

(Reference Edition) carries the definition of a captive as being one kept in bondage or in the power of another. With "captor" and "capture" one fares no differently. Oxford defines "captor" as one who takes by force, and Webster defines "capture" as meaning to take or seize forcibly. In even a table Intercollegiate Dictionary, the verb "capture" is said to mean "To take or seize by force, surprise or strategem, as an enemy or his property; take captive; make a prize or prisoner of."

Through all of these illustrations of the meaning of the same or of collateral words, one is impressed with constant and unbroken but necessitous thread of force, strategem or surprise, any or all of which impaired, opposed or restricted the will or freedom of another. No such characteristics are in the picture before us. Those participating Sunday School children did "go not, like the quarry—slave at night, Scourged to his dungeon."

They went not even in squads or platoons, "A mighty-army, men and boys, The matron and the maid." Counsel would have us believe that the children were *"ordered"* into the waiting-by cars. Not so. We prefer the word "shepherded" as it applies to the action of Mrs. Garner, the Sunday School Superintendent. But not even this watered-down version can be attributed to defendant Drain. His car was at the curb; its door was hospitably open. He asked no one to enter; he didn't care whether anyone got in or not because he and his daughter were going anyway, either alone or with anyone choosing to accept his company, whether it was the Thomas children (whom he did not even know) or any three others. Were the uninjured Thomas children also captives, and if they were, we know of no action against him for assault and battery or for kidnapping. And what of the Drain youngster? And of the other unknown two? Were they also "captives"? To ask the questions is to answer them.

Plaintiff Robert Thomas embarked under no compulsion, strategem or surprise. He embarked because his sister Donna, "the boss" who ruled the roost, also embarked, as did his younger brother. And even so, there were several other cars waiting, ready and able to transport them when and if they had simply entered any one of those other cars. In the case before us there

was no captive, no captor, no capture; only a defendant who simply "wanted to help."

Was plaintiff Robert then a passenger or a guest? Under and in view of the clear facts of this case, as summarized above, we hold that he was a guest, just as were his sister and brother, and the other unknown two. They were indisputably not paying passengers or members of a car pool as in *Lisner* v. *Faust*, 168 Ohio St., 346. Nor was there here any benefit over and above mere pleasure to defendant Drain, a fact clearly distinguishing this case from *Burrow* v. *Porterfield*, 171 Ohio St., 28, and the supporting cases cited therein upon which Justice Matthias relied. We do not consider *Sabo* v. *Marn*, 103 Ohio Ap., 113, or *Lombardo* v. *DeShance*, 167 Ohio St., 431, helpful here except insofar as they show how far the courts go to hold one a guest rather than a passenger. Nor is this case akin to *Vest* v. *Kramer*, 158 Ohio St., 78, wherein plaintiff and defendant were in a joint enterprise for defendant's benefit.

The closest, most cogent reasoning we have found is that of Justice Hart in *Hasbrook* v. *Wingate*, 152 Ohio St., 50. His beautifully worded differentiation in the all too hazy penumbra between passenger and guest is well epitomized for the case before us by the second clause of the third syllabus of that case. In emphasizing that clause, we quote the entire syllabus:

"3. Where, in the carrying of a rider, a motor vehicle's direct operation tends to promote the mutual interests of both the rider and driver, thus creating a joint business relationship between them, or where the rider accompanies the driver at the instance of the latter for the purpose of having the rider render a benefit or service to the driver on a trip which is primarily for the attainment of some objective of the driver, the rider is a 'passenger' and not a 'guest'; *but if the carriage confers a benefit only on the rider and no benefit other than such as is incidental to hospitality, good will or the like is conferred on the driver, the rider is a 'guest.'* "

In the case before us, plaintiff Robert was a guest, not a passenger of one who just "wanted to help." We also find that willful and wanton negligence was neither pleaded nor proven; also, that defendant Drain's driving was not the proximate cause of plaintiff Robert's injury.

We consequently make the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. Plaintiff Robert was not the "captive" of defendant Drain.

2. Plaintiff Robert was the guest of defendant Drain.

3. Willful and wanton negligence was neither pleaded nor proven by plaintiff Robert; nor is there a preponderance of evidence that defendant Drain was negligent.

4. Even if plaintiff Robert was a non-paying passenger, defendant Drain was not the proximate cause of Robert's injury.

## CONCLUSION OF LAW

There is no legal liability running from defendant Drain to plaintiff Robert, or his parents and next friends, for his injuries.