LEADER THEATRE CORPORATION, Plaintiff, *v.* RANDFORCE AMUSEMENT CORPORATION et al., Defendants.

Supreme Court, Special Term, New York County, October 17, 1945.

**282**

*Emil K. Ellis* for plaintiff.

*Harry Sabbath Bodin* and *Herbert J. Fabricant* for Randforce Amusement Corporation, defendant.

*Frederick W. P. Lorenzen* and *Caesar L. Pitassy* for Twentieth Century-Fox Film Corporation, defendant.

BOTEIN, J. This is an action for an injunction. The theory of the complaint of the plaintiff Leader Theatre Corporation (hereinafter called " Leader ") is that the defendants Randforce Amusement Corporation (hereinafter called " Randforce ") and Twentieth Century-Fox Film Corporation (hereinafter called " Fox ") entered into conspiracy to restrain trade and competition in violation of section 340 of the General Business Law of this State commonly known as the Donnelly Antitrust Act, and section 580 of the Penal Law.

Leader and Randforce are moving picture exhibitors who operate theatres in the borough of Brooklyn. Defendant Fox is producer and distributor of motion pictures. The gravamen of the complaint is that Fox has so licensed the exhibition of its copyrighted films that the Culver Theatre, owned and operated by defendant Randforce, enjoys the " first run " of Fox films in the community or immediate neighborhood in which it and the plaintiff's Leader Theatre are located. By " first run " is meant the first showing or engagement of a picture in a community or locality in which there are two or more competing theatres.

The plaintiff, complaining that the Culver Theatre now receives Fox films for exhibition before the Leader Theatre, contrasts this situation with that which obtained from 1931 until July 23, 1944. During that period Randforce operated

both the Leader and the Culver Theatres, and the Leader Theatre exhibited Fox films prior to their showing by the Culver. The decision by Fox to give the "first run" to the Culver Theatre after July 23, 1944, when Randforce no longer operated the Leader Theatre, is alleged by the plaintiff to have been an unreasonable and unlawful restraint, motivated by improper factors which stamp that decision as violative of section 340 of the General Business Law (the Donnelly Act) and of section 580 of the Penal Law. The plaintiff, therefore, demands that the Leader be restored to the position it formerly enjoyed with respect to film exhibition dates, during the period when Randforce was operating that theatre.

The answer of the defendant Randforce consists of a general denial. Fox also interposes a general denial, and sets forth two affirmative defenses: (1) if the Donnelly Act and section 580 of the Penal Law are construed to affect, regulate and control the business of Fox in the manner claimed by the plaintiff, they constitute an improper burden and restraint upon interstate commerce, and (2) if these statutes are construed as plaintiff contends, so as to require Fox to license its copyrighted pictures upon terms contrary to its choosing, they violate the provisions of the Constitution and the laws of the United States dealing with copyrights.

The affirmative defenses of Fox present certain important preliminary questions of law. The first question which must be resolved is whether the Donnelly Act, which is the New York State Antitrust Act, can properly be invoked in this case.

Fox is indubitably engaged in a commercial enterprise with substantial interstate contacts. In an action brought under the Sherman Antitrust Act (U. S. Code, tit. 15, § 1 *et seq.*) for the acts complained of a court would be constrained to conclude that interstate commerce is involved. But this does not preclude the applicability of the Donnelly Act.

It is now well established that States, under their police power, can enact and implement legislation which affects interstate commerce, when such commerce has significant local consequences (see *S. C. Highway Dept.* v. *Barnwell Bros.,* 303 U. S. 177; *Duckworth* v. *Arkansas,* 314 U. S. 390; *Parker* v. *Brown,* 317 U. S. 341; *U. S.* v. *Underwriters Assn.,* 322 U. S. 533, 548). Of course, State legislation which conflicts with Federal legislation (e.g., *McGoldrick* v. *Gulf Oil Corp.,* 309 U. S. 414; *Cloverleaf Co.* v. *Patterson,* 315 U. S. 148), or which discriminates against interstate commerce, is unconstitutional (The Federalist, No. 41; *Di Santo* v. *Pennsylvania,* 273 U. S.

34; *Hartford Indemnity Co.* v. *Illinois*, 298 U. S. 155; *Robbins* v. *Shelby Taxing District*, 120 U. S. 489, 494; *Caldwell* v. *North Carolina*, 187 U. S. 622). And State legislation purporting to affect interstate commerce is likewise ineffective if such State legislation has been specifically precluded by Congressional action.

But the foregoing cases, limiting State regulatory power under the commerce clause of the United States Constitution (art. I, § 8), apparently contemplate an actual or implied conflict in the State and Federal laws, or State legislation on an activity which has no local consequences and is exclusively interstate in character. For it has been held that State legislation which *implements* Federal legislation is permissible although that State legislation relates to an activity almost entirely interstate in nature (*Parker* v. *Brown*, 317 U. S. 341, *supra*). State acts similar to Federal acts in language and scope have been upheld even where it is recognized that the State act affects interstate commerce (see *Terminal Assn.* v. *Trainmen*, 318 U. S. 1; *Matter of Davega-City Radio* v. *Labor Board*, 281 N. Y. 13; cf. *Edison Co.* v. *Labor Board*, 305 U. S. 197). More particularly, the Supreme Court of the United States has sustained the applicability of a State antitrust act while the Sherman Act was in effect, although that State act affected interstate commerce (*Standard Oil Co.* v. *Tennessee*, 217 U. S. 413). Indeed, the joint applicability of the Sherman Act and State antitrust legislation has scarcely ever been questioned (*Paine Lumber Co.* v. *Neal*, 212 F. 259, affd. 214 F. 82, affd. 244 U. S. 459; *Straus* v. *Am. Publishers' Assn.*, 231 U. S. 222).

The only discernible limits upon State action affecting interstate commerce, where similar and consistent Federal legislation exists, are: (1) that some local interests be involved; and (2) that no Federal agency has acted with respect to the *particular matter* being considered by the State agency (*Welch Co.* v. *New Hampshire*, 306 U. S. 79; *Matter of Davega-City Radio* v. *Labor Board, supra; Alleghany Ludlum Steel Corp.* v. *Kelley*, 184 Misc. 47, affd. 269 App. Div. 805).

Neither of these limitations forecloses action under the Donnelly Act in the instant case. It is clear that the exhibition and display of these motion pictures is of substantial local significance, regardless of the interstate commerce activities involved in making films available for such exhibition and display. The case at bar involves specifically just these local considerations of exhibition and display. Moreover, no specific intervention

on the part of any Federal agency in the instant case has been brought to my attention.

Similarly, I conclude that the Donnelly Act is not inoperative because Fox has a copyright in the films it distributes. It is, of course, manifest that a copyright is a Federal right (*Straus* v. *Am. Publishers' Assn.*, 231 U. S. 222, *supra*). But it would be unique doctrine to hold that no Federal rights are subject to State regulation of any sort. Royalties from copyrighted films are not exempt from State taxation (*Fox Film Corp.* v. *Doyal*, 286 U. S. 123), and films are subject to State censorship (*Mutual Film Corp.* v. *Ohio Industrial Comm.*, 236 U. S. 230). It appears that the New York State Donnelly Act does not fall outside of the scope of these principles, since that act has been applied in several instances to Federal statutory and constitutional rights (*Straus* v. *Am. Publishers' Assn.*, *supra*; *Remington Rand, Inc.*, v. *International Business M. Corp.*, 167 Misc. 108, 116; *People* v. *Masiello*, 177 Misc. 608, 614; see *Landauer* v. *Bard-Parker Co., Inc.*, 125 Misc. 461). For these reasons I conclude that the existence of a copyright in the films being exhibited does not in and of itself place the acts of the defendants outside of the scope of the Donnelly Act any more than it places those acts beyond the influence of the Sherman Act (*U. S.* v. *Crescent Amusement Co.*, 323 U. S. 173; *Interstate Circuit* v. *U. S.*, 306 U. S. 208; *Bobbs-Merrill Co.* v. *Straus*, 210 U. S. 339).

It is also necessary, at this point, to consider the contention of the defendants that the licensing of these copyrighted films does not relate to an article, a product, a commodity or a service used in the conduct of trade, commerce or manufacture within the meaning of the Donnelly Act. The defendants assert the applicability herein of the recent decision in *Hotel Edison Corp.* v. *Taylor* (185 Misc. 681, 682, affd. 268 App. Div. 1029█). That case held as follows with respect to the licensing of a copyright: " No claim is made that the defendant ASCAP deals in any commodity; it is engaged solely in licensing intangible rights created and conferred upon its members by the copyright laws of the United States; a copyright is an intangible thing, is not trade or commerce (*Harms* v. *Cohen*, 279 F. 276, 281; *Metropolitan Opera Co.* v. *Hammerstein*, 162 App. Div. 691, affd. 221 N. Y. 507)."

I entertain serious doubts as to whether the cases cited in this decision are controlling in this suit (see *Remington Rand,*

*Inc.,* v. *International Business M. Corp., supra;* cf. *Ring* v. *Spina,* 148 F. 2d 647, 650). The licensing of a film copyright has not been deemed so intangible a right as to render inoperative the provisions of the Sherman Act (*Binderup* v. *Pathe Exchange,* 263 U. S. 291; *Paramount Famous Corp.* v. *U. S.,* 282 U. S. 30; *U. S.* v. *First Nat. Pictures, Inc.,* 282 U. S. 44; *White Bear Theatre Corp.* v. *State Theatre Corp.,* 129 F. 2d 600), and the Donnelly Act has been held applicable to cross-licensing of patents (*Remington Rand, Inc.,* v. *International Business M. Corp., supra*). Moreover, although the licensing of a copyrighted film may be deemed an incorporeal right for some legal purposes, it is certainly an item of such economic value, desirability and influence as to constitute an " article or commodity " in the economic sense. When it is considered that implicit in this particular right is the potentiality of seriously affecting the economic existence of local moving-picture theatres which form a substantial constituent of this State's trade and commerce, it would seem that only by some unrealistic, aloof and legalistic process can such an activity be exempted from the Donnelly Act as a right which is not an " article " or " commodity " used in " trade " or " commerce ".

However, the facts of the instant case make it apparent that the *Hotel Edison* case (*supra*) is not binding herein. For the case at bar involves not only the licensing of a copyright, but the licensing of the film and the right to exhibit such film. Fox is not " engaged solely in licensing intangible rights ". It is engaged in renting films, which are in the nature of physical commodities, to exhibitors with the attendant right to exhibit those films. The right which was licensed in the *Hotel Edison* case (*supra*) is at least one step removed, for ASCAP did not handle any tangible, vendible commodity such as a film: it merely licensed copyrights unattended by the handling of any tangible object. In the one case ASCAP licensed the right to perform; here, it can be argued, Fox licensed a performance, inextricably interwoven with the delivery of prints delivered to the exhibitor for reflection upon a screen. It is for this reason, evidently, that the *Hotel Edison* opinion (*supra*) did not embrace a consideration of previous decisions of this department which held the Donnelly Act applicable to the distributor-exhibitor relationship (*J. J. Theatres, Inc.,* v. *Twentieth Century-Fox Film Corp.,* 265 App. Div. 994; *Peekskill Theatre, Inc.,* v. *Advance Theatrical Co.,* 206 App. Div. 138).

With the affirmative defenses disposed of as matter of law, I proceed to a consideration and determination of the facts in this case.

Randforce, at all times since 1914, has been engaged in the operation of motion-picture theatres in and about the city of New York. Since the year 1931, it has operated and is now operating the Culver Theatre as a motion-picture theatre at McDonald Avenue and 18th Avenue in the borough of Brooklyn. From prior to 1931 and until July 23, 1944, when its lease was surrendered, Randforce also operated as a motion-picture theatre the Leader Theatre, located at 947 Coney Island Avenue, Brooklyn, in the same immediate neighborhood as the Culver Theatre.

Fox has been engaged in the business of producing motion pictures, principally in the State of California, and also in other States and places. The pictures so produced upon negative films are then duplicated upon positive prints which are distributed for exhibition in theatres throughout the United States. This distribution of pictures by Fox consists of the licensing of exhibition rights to the pictures and the loaning of prints for exhibition in theatres, pursuant to license agreements for exhibition rights entered into with various exhibitors throughout the United States. The controversy here concerns the method of distribution of the type of motion picture known in the trade as a feature picture, which may be defined as a picture telling a continuous story and generally in excess of 6,000 feet in length.

Since 1931 Randforce, pursuant to a long-term agreement entered into between it and Fox in December of that year, and embracing the exhibition of Fox pictures in all of its theatres, exhibited Fox pictures in the neighborhood of the Culver and Leader theatres on a run which followed, after a period of clearance, the dates or runs or showings enjoyed by certain other Brooklyn theatres. And for a number of years prior to July, 1944, it is undisputed that Randforce, as between the Leader and Culver Theatres which it operated in the same neighborhood, exhibited Fox pictures first run at the Leader Theatre.

In July, 1944, Selstorch Corporation, organized by the same interests as those controlling the plaintiff, acquired a fee interest in and to the Leader Theatre. Thereupon, the lease which Randforce held upon that theatre was terminated. Plaintiff leased the theatre from Selstorch Corporation and caused the Leader Theatre to be closed temporarily for alterations. Thereafter, and also subsequent to the reopening of the Leader Theatre under the operation of the plaintiff, Fox pictures have been exhibited first run at the Culver Theatre, which continued to be operated by defendant Randforce.

The foregoing is an abbreviated background for the acts which allegedly constituted the conspiracy and violation of the Donnelly Act. They assume greater significance when it is appreciated that the defendants acted within the framework of a system of runs and clearances which has evolved in the motion-picture industry for the distribution of pictures, and which system, as such, is granted by all parties to be an economic necessity.

The following definition of clearance has been adopted by the parties: "Clearance means the period of time, fixed by an agreement between a distributor and an exhibitor, prior to the expiration of which a feature licensed for prior exhibition in a theatre may not be exhibited in another theatre or theatres."

During the course of the trial there was continuous skirmishing as to the use of the term clearance. Most of this is not germane to the issues as I see them, except that a first run granted to one theatre as against another would appear to be a contradiction in terms if there were not imposed a clearance for some period of time in favor of the first theatre against the second.

Distributors seek to grant runs and fix clearances in such fashion that one picture will not be shown in competition with itself at two neighborhood theatres. To avoid this result, which Fox contends would invite financial suicide, and for other economic reasons as well, the industry at large has for at least thirty years employed the system of distribution above discussed, implemented with runs and clearances.

Feature motion pictures are expensive productions. The pictures concerned in this controversy represent a production cost to Fox of between a million and a half dollars and four million dollars each. The positive prints, which are the media for the exhibition of pictures in theatres, cost about $200 each. The average license fee paid by the theatres does not equal the cost of making one positive print.

The number of positive prints of any feature motion picture available for exhibition in theatres is necessarily limited by the economic situation, and each must be used for exhibition in a large number of theatres. This is the only formula which the industry has evolved for liquidating the large production investment in a picture, the substantial positive costs of prints and the other costs involved in distribution. In arranging the sequence for the use of the limited number of prints by the large number of theatres, the motion-picture industry, including Fox, uses the system of runs and clearances, not only to afford a method for the ordered, seriatim use of the limited number of

prints in a large number of theatres, but also to safeguard the distributor's revenue. This revenue is derived from license fees, which are essentially determined upon the basis of a fair participation by the distributor in the revenue realized by a picture at the box office.

Furthermore, the avoidance of competition is claimed to benefit the exhibitors and the public. Very large license fees are obtained from the great, de luxe first-run theatres. These theatres can afford to pay such fees only if they are the first in a community to exhibit the pictures, and if there is also a period of time, i.e., a clearance, elapsing before competing theatres paying smaller license fees show the same picture. Through this system of runs and clearances the smallest theatres, paying perhaps $12 or $15 as a license fee, may show the same picture for which the large de luxe first run houses pay fees which may exceed $100,000. This scale in license fees is, of course, reflected in admission prices to the public. The public is provided with the opportunity of seeing the same picture at admission prices which, in a given community, may range from over $1 to 10¢ or 15¢.

But, of course, regardless of the benefits attendant upon a system of runs and clearances, it is evident that this practice clearly involves a restraint. For only one exhibitor in the community can exhibit a film at a particular time. However, the plaintiff herein does not contend that the routine of runs and clearances per se constitutes a violation of the Donnelly Act or the Penal Law. It is its contention, as I see it, that the defendant Fox was not motivated by legitimate business reasons in granting the first run for that immediate neighborhood to the Culver, so as to thereby favor that theatre with a clearance as against the Leader, and that it did so at the behest of Randforce in order to restrain and suppress competition from the plaintiff, to insure its failure in operating the Leader and because of the resentment borne the plaintiff by Randforce at the leasing of that theatre to the plaintiff.

The plaintiff was constrained to attempt to establish its case in large part from the lips of the officers and employees of the defendants. I shall sketch the evidence upon which the plaintiff asserts it has proven its case.

In July, 1944, Sam Rinzler, the president of Randforce, advised one Moon, branch manager of Fox in New York, that the plaintiff had acquired the fee of the Leader while Randforce was negotiating for a renewal of the lease and that Randforce would no longer operate that theatre. Rinzler also advised

Moon that Randforce would like to continue to exhibit Fox pictures on a first run in the neighborhood when Randforce ceased to operate the Leader Theatre. At the conclusion of the discussion Moon advised Rinzler that he would consider the request which had been made.

The plaintiff, after it acquired the Leader, became a member of the Island Theatres Circuit, which was the common buying agency for about forty-three theatres. Shortly before the reopening of the Leader, one Liggett, a representative of the Island Theatres Circuit, called upon Moon of Fox and requested that Fox license its feaure motion pictures for first neighborhood run to the plaintiff for the Leader. At this conference Moon was pressed for a decision, and advised Liggett that Fox would not license its pictures first run to the plaintiff for the Leader Theatre, and that Fox recognized in Randforce a first run customer in this situation.

Shortly thereafter, Liggett, accompanied by Storch, president of the plaintiff, again called upon Moon and again requested Moon to license Fox pictures on a first run to the plaintiff for the Leader Theatre. Moon once more denied this request.

Moon had another conference with Rinzler and at that time informed him that he had decided to license pictures for first run exhibition to Randforce at the Culver Theatre. Moon subsequently submitted his decision to his superior, Andrew W. Smith, the general sales manager of Fox for its Eastern Division, who advised him that he approved the decision. There was some testimony concerning the 1931 franchise agreement which Rinzler claimed by its provisions entitled Randforce to first run in the neighborhood, but Fox denies that this agreement was a determinative factor in arriving at its decision.

From the foregoing it is apparent that the record does not affirmatively reveal that the action of Fox was motivated by a desire to injure Leader or to drive Leader out of business. At no point is it demonstrated that Randforce sought to keep Leader from obtaining subsequent runs of Fox films or to deprive Leader of the first runs of the films of other producers (cf. *Alexander's Dept. Stores, Inc.*, v. *Ohrbach's, Inc.*, 266 App. Div. 535). Leader has retained the right to first runs with respect to films of other producers, and Fox has repeatedly made available to Leader subsequent runs of Fox films. In short, I am convinced that no bad faith or monopolistic situations are here involved. Thus, although it is elementary that good intentions are not conclusive in antitrust cases, the absence of bad faith casts these facts into a pattern of competition rather

than of malicious interference or monopoly. And the single question of fact which remains is whether the selection made by Fox was premised upon considerations constituting an undue restraint upon competition.

The plaintiff asserts that, pursuant to trade practice, a run or clearance once enjoyed by a theatre, always remains with that theatre, or, in a manner of speaking, adheres to the bricks and mortar of the theatre. The defendants contend that, in the motion-picture industry, revenue is generally the principal factor in determining who is to have a run and in determining the matter of clearance, and they repudiate the brick and mortar theory.

The defendants marshal an impressive array of facts and considerations in support of their contention that Fox in selecting Randforce with its Culver Theatre as the customer to exhibit first run in the neighborhood, made an ordinary decision in the usual course of business, animated primarily by the revenue potentialities of the two theatres, or, in other words, by its judgment as to which exhibitor promised to be the more profitable outlet for Fox.

Since the skill, integrity and reliability of the competing exhibitors are very important factors in determining their revenue producing potentialities, there is justification in the choice by Fox of its customer of long standing in preference to a new and unknown exhibitor. Moon had known Rinzler, the dominant figure in Randforce, for fifteen years as an outstanding, experienced and respected leader in the industry, and Smith had known him as such for twenty years. Randforce had operated theatres in the Brooklyn area since 1914 with great skill and success, and Fox had distributed pictures to it under a profitable and satisfactory arrangement since at least 1931. On the other hand, little, if anything, was known about Storch, the president of the plaintiff corporation, except that he was a fairly recent arrival in this country, who had operated a small, second-run theatre in Brooklyn for a limited period of time.

Furthermore, the history of operation of the two theatres, before and after July, 1944, indicates that the Culver has consistently attracted more actual patronage and dollar revenue than has the Leader. During the exhibition season preceding the summer of 1944, the Culver, although playing all of its pictures on a second run after the Leader and charging slightly lower admission prices, outdrew the Leader Theatre in attendance in excess of 125,000 patrons and collected about $25,000

more in box-office receipts than did the Leader. Since the operation of the Leader by the plaintiff, for the months from September, 1944, to May, 1945, the Culver, playing Fox pictures on a first neighborhood run and all other feature pictures either after the Leader Theatre or after the nearby Midwood Theatre and charging a slightly lower admission price, has outdrawn the Leader by more than 100,000 patrons and has collected $18,382.05 more in box-office receipts than has the Leader.

The significance of these figures is evidenced by the fact that the Randforce agreement with Fox, called for a minimum license fee for each picture, and, in addition, for a specified percentage of the net over-all profits derived from the exhibition of the picture, determined according to a certain formula. The most favorable finding I can make as to the plaintiff's offer to Fox was that it offered to pay the same prices which the Leader had paid under Randforce operation. Therefore, in view of the percentage arrangement, the revenue producing capabilities of the theatres are most revealing.

There is a sharp dispute as to which theatre had the better location, but there is at least substantial support in the record for Moon's conclusion that the Culver was better located. There was little to choose in the difference between the two theatres from the point of view of their physical condition in July, 1944.

The record, therefore, amply sustains the testimony of the Fox employees and the conclusion which I have drawn, that they made an ordinary decision in the usual course of business, upon the basis of norms long established in the industry for the granting of first runs to competing customers. The plaintiff's insistence that the fact that the first run for the neighborhood was formerly lodged with the Leader gives that theatre first run over the Culver is unconvincing. That single factor, if it merits any consideration, certainly cannot be deemed to be more decisive than those just considered.

Nor does plaintiff aid its cause by insisting that Leader was needlessly deprived of its first run because the Leader and the Culver are not in competition with each other. If plaintiff could prove an absence of competition it would also prove that it had not been injured when the first run of Fox films was given to the Culver Theatre. In any event, without reviewing the extensive testimony in this regard, I find that the Culver and Leader Theatres do in fact compete with one another. For this reason, the amendment of the prayer for relief which was granted during the trial does not alter the basic issues discussed herein.

Finally, it follows also from the foregoing that no violation of section 580 of the Penal Law has been established. Judging from the plaintiff's brief this point appears to have been virtually withdrawn.

Judgment is therefore directed in favor of the defendants. Settle findings and conclusions.