[Civ. Nos. 41861, 40228. Second Dist., Div. Five. Feb. 28, 1974.]

R. E. SPRIGGS COMPANY, INC., et al., Cross-complainants and Appellants, v.
ADOLPH COORS COMPANY, Cross-defendant and Respondent.

654

## COUNSEL

Demetriou & Del Guercio, Richard A. Del Guercio, Thomas Elke and James R. Jurecka for Cross-complainants and Appellants.

McCutchen, Black, Verleger & Shea, G. William Shea, James E. Allen, Jr., Franklin H. Wilson and Christopher J. Margolin for Cross-defendant and Respondent.

## OPINION

**STEPHENS, Acting P. J.**—This is an appeal from a dismissal of appellant's third cause of action on the ground that the court lacked jurisdiction to consider the action.

In brief, respondent Adolph Coors Company (hereinafter, Coors) is a corporation organized and existing under the laws of the State of Colorado and is authorized and qualified to do business in the State of California. Coors manufactures, brews and bottles beer only in Golden, Colorado, and sells its beer to wholesale distributors in the western United States, including California. All sales are made FOB Golden, Colorado. Coors does not distribute or sell its beer other than to wholesale distributors. Appellant R. E. Spriggs Co., Inc. (hereinafter, Spriggs) operated a wholesale beer distribution business in Los Angeles County.

By agreement with Coors, Spriggs distributed Coors' products in Los Angeles County from 1937 until termination on September 22, 1965. The written distribution agreements between Spriggs and Coors and between Coors and other wholesale distributors who distributed Coors' beer in Los Angeles County and other areas in California designated the territory within which each such distributor could distribute Coors beer.

In its third cause of action, Spriggs alleged combinations in restraint of trade and sought damages under the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.).[1] In the joint pretrial statement, Spriggs contended that the written agreements violated the Cartwright Act by reason of the territorial limitations contained therein; that the agreements between Coors and its distributors resulted in territorial limitations, price-fixing and conspiracy to exclude Spriggs from selling beer at locations within and without Los Angeles, all in violation of the Cartwright Act. There is no question but that at all times relevant to this case Coors was engaged in interstate trade and commerce. All sales of this beer by Coors to Spriggs were made in such interstate commerce. The trial judge found that interstate commerce was directly involved in the sale of Coors beer to Spriggs and held that the supremacy clause of the United States Constitution (art. VI, cl. 2) and the Sherman Antitrust Act (15 U.S.C. §§ 1 and 15) precluded the application of the Cartwright Act to the factual situation presented by the third cause of action and the evidentiary record.

The judgment entered by the trial court dismissing the third cause of action for lack of jurisdiction is the only issue raised by the present appeal.

Although the commerce clause of the federal Constitution[2] provides that "Congress shall have the power . . . to regulate Commerce with foreign nations and among the several states, . . ." nothing in this clause expressly provides that the power of Congress to regulate interstate commerce is exclusive or that the states have no power to regulate interstate commerce. However, the Supreme Court has recognized that the constitutional grant of the power to Congress under the commerce clause to regulate commerce among the several states necessarily implies the sub-

---

[1]Business and Professions Code section 16750, subdivision (a): "Any person who is injured in his business or proprety by reason of anything forbidden or declared unlawful by this chapter, may sue therefor in any court having jurisdiction in the county where the defendant resides or is found, or any agent resides or is found, or where service may be obtained, without respect to the amount in controversy, and to recover three times the damages sustained by him, and shall be awarded a reasonable attorneys' fee together with the costs of the suit."

[2](U.S. Const., art. I, § 8, cl. 3.)

ordination of the states to that power. (See, e.g., *Milk Board* v. *Eisenberg Co.*, 306 U.S. 346 [83 L.Ed. 752, 59 S.Ct. 528].)

■ Where the activity is exclusively in interstate commerce without intrastate aspects, the commerce and supremacy clauses of the United States Constitution prohibit state regulation or interference with that activity. It is equally axiomatic that where the activity and its effect is wholly intrastate, the states retain full authority under their police powers to regulate the activity. The central issue to be resolved in this case is the nature and extent of Congress' power in the field of a bifurcated activity which has both interstate and intrastate aspects.

Respondent contends that Congress' power is exclusive. However, review of the case law in this area, particularly with respect to the need to reconcile the fact of our federalism with the reality of the reservation of the commerce power in the Congress, convinces us that Congress' power is merely paramount and does not, without more, proscribe state regulation of the intrastate aspects of a commercial activity.

■ A state law is not invalid merely because it regulates commerce, and the mere grant of the commerce power to the federal government does not of itself preclude state action. (*Breard* v. *Alexandria*, 341 U.S. 622, 634-635 [95 L.Ed. 1233, 1243-1244, 71 S.Ct. 920, 35 A.L.R.3d 335]; *Cities Services Co.* v. *Peerless Co.*, 340 U.S. 179, 186-187 [95 L.Ed. 190, 201-202, 71 S.Ct. 215].)[3] The fact that Congress has acted to prevent

[3]The regulatory power of the federal government relative to interstate commerce is clearly distinguishable from its power over foreign affairs: "As a sovereign power possessed by the nation, the power over foreign affairs is *inherent, exclusive,* and *plenary*. It is inherent, since . . . it does not depend for its existence upon the affirmative grants of the Constitution. It is exclusive in the Federal Government, both because of express prohibitions on the states in this field and because only the Union is vested with the attributes of external sovereignty. For national purposes, embracing our relations with foreign nations, we are but one people, one nation, one power. [Footnotes omitted.]" (Schwartz, A Commentary on the Constitution of the United States (1963) § 206, at pp. 97, 98.) See *United States* v. *Belmont*, 301 U.S. 324, 330 [81 L.Ed. 1134, 1139, 57 S.Ct. 758]: "Governmental power over external affairs is not distributed, but is vested exclusively in the national government." See also *Bethlehem Steel Corp.* v. *Board of Commissioners*, 276 Cal.App.2d 221, 225 [80 Cal.Rptr. 800]: "The powers of external sovereignty do not depend upon the affirimative grants of the Constitution, but are vested in the federal government as necessary concomitants of nationality. [¶] The exclusivity of the federal government's power in this sphere is predicated upon the 'irrefutable postulate and though the states were several, their people in respect of foreign affairs were one.' [Citation.] 'The several states are bereft of power in this field since 'in respect of our foreign relations generally, state lines disappear.' [Citations.] Hence, the external power of the United States is exercisable 'without regard to state laws or policies' and 'is not and cannot be subject to any curtailment or interference on the part of the several states.' " (Fns. omitted.)

restraints on trade in interstate commerce, of itself, does not invalidate legislation by a state effecting substantially the same result. The fundamental inquiry in such instances is whether the state legislation is in conflict with national policy. (*California* v. *Zook,* 336 U.S. 725, 729 [93 L.Ed. 1005, 1009, 69 S.Ct. 841].) The power which reposes in Congress under the commerce clause extends to three categories of commercial activities: first, the use of the channels of interstate commerce; second, protection of the instrumentalities of interstate commerce or persons or things in commerce; third, those activities affecting interstate commerce. (*Perez* v. *United States,* 402 U.S. 146 [28 L.Ed.2d 686, 91 S.Ct. 1357].) It is with this last aspect that we are concerned,[4] as it is in that category that Congress is given a wide latitude within which it may regulate.

In the case of *Wickard* v. *Filburn,* 317 U.S. 111 [87 L.Ed. 122, 63 S.Ct. 82], a unanimous court held that wheat grown wholly for home consumption was constitutionally within the scope of federal regulations. There the court said: "[E]ven if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature be reached by Congress, if it exerts a substantial economic effect on interstate commerce . . . . (317 U.S. at p. 125 [87 L.Ed. at p. 135].) This recognition that the test of interstate commerce envisions a qualitative rather than a quantitative standard has been followed to the present. (*Perez* v. *United States, supra; Atlanta Motel* v. *United States,* 379 U.S. 241 [13 L.Ed.2d 258, 85 S.Ct. 348]; *Katzenbach* v. *McClung,* 379 U.S. 294 [13 L.Ed.2d 290, 85 S.Ct. 377].)

However, the recognition that Congress has the power to act does not ipso facto negate the state's power to regulate. The rule is that in the absence of clear occupation of the field in which the activity is to be regulated, a state may regulate the interstate aspects of an activity, even though the regulation has some effect upon interstate commerce. (See, e.g., *Head* v. *New Mexico Board,* 374 U.S. 424 [10 L.Ed.2d 983, 83 S.Ct. 1759]; *Huron Cement Co.* v. *Detroit,* 362 U.S. 440 [4 L.Ed.2d 852, 80 S.Ct. 813, 78 A.L.R.2d 1294].)

---

[4]The challenged activity relates solely to the use by Coors of territorial limitations within California. We are not required to review the entire distribution scheme used by Coors. (See *Flood* v. *Kuhn* (2d Cir.) 443 F.2d 264, affd. 407 U.S. 258 [32 L.Ed. 2d 728, 92 S.Ct. 2099].) However, since California's regulation of Coors' distribution scheme would clearly affect Coors' overall methods of distribution which are in interstate commerce, interstate commerce is both involved and affected.

It is not contended that the Cartwright Act imposes an "undue burden" upon commerce, or that it discriminates against interstate commerce. The Cartwright Act does not impose an economic barrier protecting local industry such as was condemned in *Dean Milk Co.* v. *Madison,* 340 U.S. 349 [95 L.Ed. 329, 71 S.Ct. 295]. Neither does it unduly burden interstate commerce in that the Cartwright Act, as construed in *Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.,* 4 Cal.3d 842 [94 Cal.Rptr. 785, 484 P.2d 953], is complementary to the relevant provisions of the federal antitrust statutes[5] and may be justified as a reasonable means of protecting a significant state interest, i.e., prevention of unfair competition.[6] Rather, respondent's arguments center upon the contention that the relevant federal antitrust legislation has evidenced a congressional intent to occupy the field so as to preempt state regulation in this area and confine any alleged restraint of trade violation to the jurisdiction of the federal courts.[7]

In order to sustain a finding that Congress has by legislation preempted a field of commerce from state regulation, it must be shown by persuasive reasoning either that the nature of the regulated subject permits no other conclusion, or that the Congress has unmistakably so ordained. (*Florida Avocado Growers* v. *Paul,* 373 U.S. 132 [10 L.Ed.2d 248, 83 S.Ct. 1210]; *Huron Cement Co.* v. *Detroit, supra,* at p. 443 [4 L.Ed.2d at pp. 855-856].)

---

[5]"Sections 16720 and 16726 of the Cartwright Act were patterned after the Sherman Act (15 U.S.C. § 1 et seq.) and decisions under the latter act are applicable to the former. (*Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 315 [70 Cal.Rptr. 849, 444 P.2d 481].) Both acts codify the general common law prohibition against restraints of trade. Section 16727 goes beyond the common law to interdict certain practices which have a tendency to lessen competition or promote monopolization. This section, enacted in 1961 (Stats. 1961, ch. 738), is based on section 3 of the Clayton Act (15 U.S.C. § 14). Hence, federal decisions interpreting section 3 are applicable to section 16727. (69 Cal.2d 305, 315.) [Fns. omitted.]" (4 Cal.3d at pp. 852-853.)

[6]"The Cartwright Act merely articulates in greater detail a public policy against restraint of trade that has long been recognized at common law. . . . The public interest requires free competition so that prices be not dependent upon an understanding among suppliers of any given commodity but upon the interplay of the economic forces of supply and demand." (*Speegle* v. *Board of Fire Underwriters,* 29 Cal. 2d 34, 44 [172 P.2d 867]. This policy is wholly in conformity with the purposes sought to be furthered by the Sherman Act. (See, e.g., *Northern Pac. R. Co.* v. *United States,* 356 U.S. 1 [2 L.Ed.2d 545, 78 S.Ct. 514]; *Apex Hosiery Co.* v. *Leader,* 310 U.S. 469 [84 L.Ed. 1311, 60 S.Ct. 982, 128 A.L.R. 1044].)

[7]15 United States Code section 15: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, . . ." By operation of this section, violations arising under the Sherman Act must be brought in a federal forum. (*Blumenstock Bros. Advertising Agency* v. *Curtis Publishing Co.,* 252 U.S. 436 [64 L.Ed. 649, 40 S.Ct. 385].)

■ The history of the Sherman Antitrust Act makes it clear that the Congress did not intend that the federal legislation preempt parallel state efforts to control unfair competitive practices. Before the enactment of the Sherman Act, some 21 states had legislation proscribing "combinations in restraint of trade."[8] Thus, it was not by accident that Congress did not use language in its act that would expressly preclude state regulation though the activity possessed interstate qualities. Senator Sherman, in urging enactment of his bill, stated: "This bill . . . has for its . . . object to invoke the aid of the courts of the United States to deal with the combinations . . . when they affect injuriously our foreign and interstate commerce . . . and in this way to supplement the enforcement of the established rules of the common and statute laws by the several states in dealing with combinations that affect injuriously the industrial liberty of the citizens of those states. It is to arm the federal courts within the limit of their constitutional power *that they may cooperate with the state courts* in checking, curbing and controlling the most dangerous combinations that now threaten the business, property, and trade of the people of the United States. . . ." (21 Cong. Rec. 2457 (1890).) (Italics added.)

Since we perceive no congressional intent to supplant state regulation, we turn to the question of whether the nature of the regulated subject *requires* federal preeminence.

We note first that an affirmative answer would result in the nullification of much state effort in the antitrust field. If state regulations were to lose effectiveness as soon as interstate commerce is affected, a large policing area would be excluded, and the states would become helpless to protect its citizens, though no national benefit would accrue. (*Commonwealth* v. *McHugh,* 326 Mass. 249 [93 N.E.2d 751, 761-764].) Exclusion would necessarily result whenever the subject activity "substantially affects" interstate commerce. (*Burke* v. *Ford,* 389 U.S. 320 [19 L.Ed.2d 554, 88 S.Ct. 443].) While the exact parameters of the term "substantially affects" have not been set, it is apparent that there is an intent to exclude from consideration by the federal courts those activities which only incidentally affect interstate commerce.[9] (See *Standard Oil of Kentucky* v. *Tennessee,* 217 U.S.

---

[8]See Mosk, *State Antitrust Enforcement* (1962) 21 A.B.A.J. 358; Note, *The Commerce Clause and State Antitrust Enforcement* (1961) 61 Colum. L.Rev. 1469.

[9]Since the Sherman Act was enacted, the Supreme Court has recognized that some commercial activities are essentially local and are beyond the reach of the act. But the boundaries of the "essentially local doctrine" are unclear. The courts have disagreed as to just what type of local activity has the requisite impact upon commerce to sanction federal intervention. (Compare *United States* v. *Yellow Cab Co.,* 332

413 [54 L.Ed. 817, 30 S.Ct. 543].) Local restraints, however, have an inherent impact upon interstate commerce.[10] While this does not define the level of interstate commerce necessary to effectuate federal jurisdiction in any particular case, proof of degree is not generally deemed to be a constitutional prerequisite, at least where the activity is deemed to be a per se violation of the antitrust statutes, and hence proof of effects is not required.[11]

U.S. 218, 230 [91 L.Ed. 2010, 2020, 67 S.Ct. 1568] with *Times-Picayune* v. *United States,* 345 U.S. 594, 602, fn. 11 [97 L.Ed. 1277, 1286, 73 S.Ct. 872].) This uncertainty over the term "essentially local" poses the proposition that concurrent regulation is preferable to lessen the opportunity for antitrust violators to escape in a failure between state and federal authorities to exert a power of prosecution. The elimination of this twilight zone of nonenforcement was a long sought goal of both state and federal authorities. (Mosk, *State Antitrust Enforcement* (1962) 21 A.B.A.J. 358, 365.)

[10]In line with the recent expansion of Congress' power under the commerce clause (see, e.g., *Perez* v. *United States,* 402 U.S. 146 [28 L.Ed.2d 686, 91 S.Ct. 1357]; *Katzenbach* v. *McClung,* 379 U.S. 294 [13 L.Ed.2d 290, 85 S.Ct. 377]), the recent view of the federal courts in determining the scope of the federal antitrust statutes has been to afford the statutes as broad an application as is commensurate with the commerce clause. As stated in *In re Western Liquid Asphalt Cases* (9th Cir. 1973) 487 F.2d 202, 204:

"We start with the proposition that Congress in passing the Sherman Act desired to exercise the full extent of its Constitutional power in restraining trust and monopoly agreements. [Citations.] As the Supreme Court's reading of the commerce clause has broadened over time, so has its interpretation of the jurisdictional scope of the Sherman Act. *See* cases collected at Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 231, 68 S.Ct. 996, 92 L.Ed. 1328 (1948). Thus, every Sherman-Act holding that jurisdiction does not lie is a holding that the evil alleged is beyond the power of Congress to control. Conversely, a holding that conduct is within the reach of Congress' constitutional power for some other purpose is entitled to great weight in a Sherman Act case. [Citations.]

"There are, of course, limits to the technique of relying on determinations of the breadth of the commerce power made in one area of congressional regulation in order to determine the breadth of the commerce power in another. First, 'interstate commerce is an intensely practical concept drawn from the normal and accepted course of business.' [Citations.] Although the power of Congress over commerce is unitary, different evils sought to be regulated may impinge on commerce in different ways and to differing extents, and the power of Congress may vary accordingly. (*See* McLeod v. Threlkeld, 319 U.S. 491, 495, 68 S.Ct. 1248, 87 L.Ed. 1538 (1943). Regulation of business practices through the antitrust laws, for example, may justifiably reach further than some other types of regulation because the antitrust laws are concerned directly with aiding the flow of commerce."

[11]If conduct is to be held within the ambit of the federal antitrust proscriptions because of its potential for harm and regardless of demonstrated injury in any particular case, it would be inconsistent to simultaneously require proof of effects to satisfy the statute's jurisdictional test. (Cf. *Fortner Enterprises* v. *U.S. Steel,* 394 U.S. 495 [22 L.Ed.2d 495, 89 S.Ct. 1252]; *Radiant Burners* v. *Peoples Gas Co.,* 364 U.S. 656 [5 L.Ed.2d 358, 81 S.Ct. 365]; *Klor's* v. *Broadway-Hale Stores,* 359 U.S. 207 [3 L.Ed.2d 741, 79 S.Ct. 705]. Thus, respondent's arguments, carried to their logical extensions, would deny the states authority to regulate "unfair competitive practices" whenever that practice constituted a per se violation of the Sherman Act even if the activity on its face pertained solely to intrastate commerce.

Since territorial resale limitations imposed by the seller upon the buyer after the seller has relinquished title are per se violations of the Sherman Act (*U.S.* v. *Arnold, Schwinn & Co.,* 388 U.S. 365, 379 [18 L.Ed.2d 1249, 1260, 87 S.Ct. 1856]), the instant case clearly is encompassed in a situation in which both the state and federal governments have a stake in the outcome.

In support of their contention that the nature of antitrust legislation necessitates federal preeminence, respondent has placed particular reliance upon the decision of the seventh circuit in *Kosuga* v. *Kelly* (1958) 257 F.2d 48, affd. *on other grounds,* 358 U.S. 516 [3 L.Ed.2d 475, 79 S.Ct. 429], the only modern decision which directly supports respondent's position. In *Kelly,* there was a contract made in Chicago for the sale of onions stored in Chicago. The buyer contended that the agreement was part of a price-fixing scheme and that it thus violated both the Illinois and federal antitrust laws. Even though the agreement was made and was to be performed in Illinois, the court held that the Illinois act did not apply. The court stated: "The Illinois Act . . . is applicable only to intrastate commerce, and . . . since the onions were alleged to be part of interstate commerce, the Illinois Act is without application." However, the holding apparently was not based upon the finding that the state antitrust legislation was preempted by the Sherman Act. Rather, the decision was founded upon a construction of the Illinois statute which limited *its* application *solely* to intrastate commerce. (*Henry G. Meigs, Inc.* v. *Empire Petroleum Company* (7th Cir. 1960) 273 F.2d 424, 430.) Even assuming that the decision was grounded on preemption, the decision of the court was reached without citation of case authority.[12] The single authority cited for the court's sweeping statement is a reference to Corpus Juris Secundum which states: "[S]tate antitrust laws do not apply to transactions involving interstate commerce. . . ." (15 C.J.S., Commerce, § 133(b).) However, the quote is somewhat out of context, for in the same section it is stated that ". . . practices in restraint of trade affecting intra-state commerce may constitute a violation of a state antitrust act, although they may also affect interstate commerce." These two quotations are not irreconcilable if the first is restricted to interstate commerce which has no intrastate aspects and thus is not subject to state regulation. This is not the instant case.

Respondent also relies upon the decision in *Standard Radio & Television Co.* v. *Chronicle Pub. Co.,* 182 Cal.App.2d 293 [6 Cal.Rptr 246], in

---

[12]On appeal, the United States Supreme Court did not decide this issue, noting in footnote 1 of its opinion that the claim under the Illinois Antitrust Act had been decided adversely, but had not been preserved on appeal.

which the Cartwright Act was held to be preempted by federal legislation. In that decision it was determined that the federal statute (Communications Act of 1934) evidenced a comprehensive federal scheme of regulation of the communications industry which necessitated uniform enforcement: " '. . . We think it is clear that Congress has occupied fully the field of television regulation and that that field is no longer open to the States.' " (At p. 300, quoting from *Allen B. Dumont Laboratories* v. *Carroll,* 184 F.2d 153, cert. den., 340 U.S. 929 [95 L.Ed. 670, 71 S.Ct. 490].) (See also *Halpin* v. *Superior Court,* 6 Cal.3d 885 [101 Cal.Rptr. 375, 495 P.2d 1295] on wiretap preemption.) The Communications Act created a federal commission with authority to review practices within the communication industry. (*Nat. Broadcasting Co.* v. *U.S.,* 319 U.S. 190 [87 L.Ed. 1344, 63 S.Ct. 997].) Furthermore, the intent of Congress to preempt the communications field is clearly demonstrated by its legislative history. Senate Report No. 781 discussing Senate Bill S. 3285, which later was enacted as the Communications Act of 1934, stated: "The purpose of this bill is to create a communications commission with regulatory power over all forms of electrical communications."[13] An intent to have certain provisions of a law completely occupy a field of law is evidenced by the plain and all-inclusive language. (*Halpin* v. *Superior Court,* 6 Cal. 3d 885, 898 [101 Cal.Rptr. 375, 495 P.2d 1295].) The complaint in *Chronicle Publishing* was premised upon a practice which the court had concluded was particularly within the province of the Federal Communications Commission, i.e., that the activities complained of were contrary to public policy as set forth in the Communications Act of 1934. There is no conflict between the instant holdings and that court's determination that the Cartwright Act was preempted. However, the clear intent of Congress to occupy the communications field does not evidence an intent to preempt in the total field of antitrust.

In contradistinction to the contention raised by respondent is the approach enunciated in *California* v. *Zook, supra,* 336 U.S. 725 and applied by most state courts presented with the instant question. The approach has been to reconcile the relevant state and federal interests and to find that the states have a valid interest in regulating unfair competitive practices within their jurisdictions, and that this power is not lost merely because the activity affects interstate commerce. (*Speegle* v. *Board of Fire Underwriters,* 29 Cal.2d 34, 51 [172 P.2d 867] ("Since there is no conflict between the law of this state and the Sherman Act, plaintiff may invoke the

---

[13]Report of the Senate Committee on Interstate Commerce (Sen. Rep. No. 781, 73d Cong., 2d Sess., p. 7.)

state law even if interstate commerce is involved."); *Peoples Savings Bank* v. *Stoddard,* 359 Mich. 297 [102 N.W.2d 777, 83 A.L.R.2d 344]; *State* v. *Allied Chem. & Dye Corp.,* 9 Wis.2d 290 [101 N.W.2d 133]; *State* v. *Sterling Theaters Co.,* 64 Wn.2d 761 [394 P.2d 226]; *Commonwealth* v. *McHugh,* 326 Mass. 249 [93 N.E.2d 751]; *Leader Theater Corp.* v. *Randforce Amusement Corp.,* 186 Misc. 280 [58 N.Y.S.2d 304]; affd. 273 App.Div. 844 [76 N.Y.S.2d 846].) As stated in *Alfred M. Lewis, Inc.* v. *Warehousemen etc. Local No. 542,* 163 Cal.App.2d 771, 789-790 [330 P.2d 53]: "The validity of a state statute regulating interstate transportation, containing provisions substantially the same as those of a federal act, was upheld by the Supreme Court of the United States, even though the conduct prohibited by such laws might be punishable as an offense against both the federal and state governments. (*State of California* v. *Zook, supra,* 336 U.S. 725 [69 S.Ct. 841, 93 L.Ed. 1005].) The court said (p. 730):

" 'If state laws on commerce are identical with those of Congress, the court may find congressional motive to exclude the States . . . But the fact of identity does not mean the automatic invalidity of State measures. Coincidence is only one factor in a complicated pattern of facts guiding us to congressional intent.' "

" . . . . . . . . . . . . . . .

" 'The Cartwright Act merely articulates in greater detail a public policy against restraint of trade that has long been recognized at common law.' (*Speegle* v. *Board of Fire Underwriters, supra,* 29 Cal.2d 34, 44 [172 P.2d 867].) Such a legislative enactment is within the tradition of the 'usual police powers' of the state, referred to in the Zook case as an aid in determining congressional intent. (*State of California* v. *Zook, supra,* 336 U.S. 725, 734 [69 S.Ct. 841, 846, 93 L.Ed. 1005].) The act is not in conflict with federal policy or law. To the contrary, in this area, the objective of each entity of government is the same. The state seeks to protect its citizens and the national government seeks to protect interstate commerce from a long recognized unlawful activity."

We perceive nothing inherent in the very nature of federal antitrust regulation which dictates that it be made the subject of exclusive federal regulation. ■ The power of the states to legislate in the field of economic regulation is not to be proscribed in the absence of a clear showing of a conflict with federal policy. (*Head* v. *New Mexico Board,* 374 U.S. 424 [10 L.Ed.2d 983, 83 S.Ct. 1759]; *Hines* v. *Davidowitz,* 312 U.S. 52 [85 L.Ed. 581, 61 S.Ct. 399].) Concurrent regulation has been evidenced in numerous cooperative efforts between state and federal authorities. The

United States Supreme Court has recognized the right of the states to regulate under their police power even in the face of comprehensive federal regulation in such diverse areas as literary protections (*Goldstein* v. *California,* 412 U.S. 546 [37 L.Ed.2d 163, 93 S.Ct. 2303]), highway safety (*California* v. *Zook, supra,* 336 U.S. 725), labeling (*Plumley* v.*Massachusetts,* 155 U.S. 461 [39 L.Ed. 223, 15 S.Ct. 154]), and disposition of foodstuffs (*Parker* v. *Brown,* 317 U.S. 341 [87 L.Ed. 315, 63 S.Ct. 307]). These are but specific applications of the traditional police power of the state to regulate activities conducted within the state. This right was clearly established in *Florida Avocado Growers* v. *Paul,* 373 U.S. 132, 144-145 [10 L.Ed.2d 248, 258-259, 83 S.Ct. 1210], where the court stated: "It is true that more recently we sustained a federal statute broadly regulating the production of renovated butter. But we were scrupulous in pointing out that a State might nevertheless—at least in the absence of an express contrary command of Congress—confiscate or exclude from market the processed butter which had complied with all the federal *processing* standards, 'because of a higher standard demanded by a state for its consumers.' A state regulation so purposed was, we affirmed, 'permissible under all the authorities.' *Cloverleaf Butter Co.* v. *Patterson,* 315 U.S. 148, 162. That distinction is a fundamental one, which illumines and delineates the problem of the present case. Federal regulation by means of minimum standards of the picking, processing, and transportation of agricultural commodities, however comprehensive *for those purposes* that regulation may be, does not of itself import displacement of state control over the distribution and retail sale of those commodities in the interests of the *consumers* of the commodities within the State. Thus, while Florida may perhaps not prevent the exportation of federally certified fruit by superimposing a higher maturity standard, nothing in *Cloverleaf* forbids California to regulate their marketing. Congressional regulation of one end of the stream of commerce does not, *ipso facto,* oust all state regulation at the other end. Such a displacement may not be inferred automatically from the fact that Congress has regulated production and packing of commodities for the interstate market."

In the instant case, the activity complained of has a factual nexus solely within the State of California. Coors imposes its distribution system upon all of its wholesale distributors within this state, and the consequences which arise from the use of this distribution scheme are localized. The restraints imposed have obvious intrastate aspects which the state may, under *its* police power, regulate for the public benefit. No showing has been made, nor has there been any attempt to demonstrate, that the enforcement of the Cartwright Act would obstruct the full purposes and objectives of the federal antitrust legislation. (*Hines* v. *Davidowitz, supra.*) While an exercise of concurrent regulatory power by the state and federal govern-

ments may lead to conflict, there has been no showing here that such a conflict exists. " 'It is not . . . a mere possibility of inconvenience in the exercise of powers, but an immediate constitutional repugnancy that can by implication alienate and extinguish a preexisting right of [state] sovereignty.' " (*Goldstein* v. *California, supra* (at pp. 554-555 [37 L.Ed.2d at p. 173]) quoting from The Federalist, No. 32, at p. 243; see also, *Askew* v. *American Waterways Operators, Inc.,* 411 U.S. 325 [36 L.Ed.2d 280, 93 S.Ct. 1590].)

In sum, we deal with a state act which operates in furtherance of the purpose and intent of the federal antitrust legislation, not in contravention of it. Likewise, application of the state act is solely directed to the intrastate effect of the trade involved. Under such circumstances we perceive no reason to find a preemption and hence federal exclusivity of jurisdiction.[14]

We conclude that where the effect of the application of the Cartwright Act upon interstate commerce is to facilitate competition and not to place a restraint upon it, it is one which conforms with like policies of the federal government, and the state courts have jurisdiction over the subject matter of the action.

The judgment is reversed.

Ashby, J., and Hastings, J., concurred.

A petition for a rehearing in No. 40228 was denied March 28, 1974, and respondent's petition for a hearing by the Supreme Court was denied April 24, 1974.

---

[14]We recognize that the doctrine of pendent jurisdiction allows a plaintiff in a federal forum to join a claim arising under state law which has a factual nexus with the challenged conduct. (*Mine Workers* v. *Gibbs,* 383 U.S. 715 [16 L.Ed.2d 218, 86 S.Ct. 1130]; Barron & Holtzoff, Federal Practice & Procedure (Wright ed. 1960) § 23, pp. 97-98.) The question of whether to retain the state action after dismissal of the federal action is discretionary with the federal court before which the matter is being heard. (*Rosado* v. *Wyman,* 397 U.S. 397 [25 L.Ed.2d 442, 90 S.Ct. 1207].) Since the question of the availability of a federal forum is usually determined early in the proceedings upon a motion to dismiss for lack of jurisdiction (Fed. Rules Civ. Proc., rule 12(b)(1)), the tendency would be to exercise that discretion to dismiss the state action. (*Mine Workers* v. *Gibbs, supra,* at p. 726 [16 L.Ed.2d at p. 228].)